[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 24, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-11658

_____

D. C. Docket No. 02-00268-CR-J-21-HTS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL PETERS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 24, 2005)

Before MARCUS, FAY and SILER[*], Circuit Judges.

MARCUS, Circuit Judge:

---

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

Michael Peters appeals his conviction after a jury trial for sale of a firearm and ammunition to a convicted felon, in violation of 18 U.S.C. §§ 922(d)(1) and 924 (a)(2). Peters argues that the district court improperly denied his motion for judgment of acquittal, and that § 922(d) is an unconstitutional exercise of Congress' commerce power. Because sufficient evidence was presented at trial for the jury to conclude that Peters knowingly sold a firearm and ammunition to a convicted felon, we affirm the district court's denial of Peters' motion for judgment of acquittal. In addition, because banning the sale of firearms to felons falls within the scope of Congress' commerce power, we affirm Peters' conviction.

I.

The story begins in April 2002, when the Bureau of Alcohol, Tobacco and Firearms ("ATF") began an investigation of Michael Peters, one-time owner and operator of MRM Outdoor Sports and Police Supplies ("MRM") in Branford, Florida. MRM sold firearms, among other things, and Peters was a federally licensed firearms dealer from 1994 until his license expired in April 2001. ATF Agent Nick Cheremeta had seen Peters at gun shows and knew that he was no longer a licensed firearms dealer. Accordingly, he employed a confidential informant to determine whether Peters was still selling guns out of his store.

2

The confidential informant, Harley Edward St. John, was born Gary Bruce Wilson and, prior to his entry into the Federal Witness Protection Program in 1991, had used a number of other aliases, including Charles Jerome Wilson and Ed Feagin. On November 19, 1991, under the name Ed Feagin, St. John was convicted of one count of felony aggravated assault in the Superior Court of Tattnall County, Georgia. Upon entering into the Federal Witness Protection Program in 1991, St. John was given his new name and assigned a new social security number, although he kept his actual birth date of October 26, 1951. The names Gary Bruce Wilson, Charles Jerome Wilson, Ed Feagin, and Harley Edward St. John also share a single FBI number. When St. John left the witness protection program in 1995, he kept his new name.

Acting as a confidential informant for ATF, St. John made a total of seven contacts with the defendant Peters, all of which he tape recorded. St. John's first contact with Peters was on April 11, 2002, when Agent Cheremeta sent him into Peters' store to buy a box of ammunition. St. John talked with Peters at some length, making no mention of his felony conviction, before purchasing the ammunition.

On May 9, 2002, Agent Cheremeta instructed St. John to call Peters to discuss local gun shows. After learning that Peters planned to attend a gun show

on May 26, Agent Cheremeta sent St. John to that show to buy two firearms from Peters. After browsing Peters' merchandise, St. John inquired whether he could make a purchase "without a background," to which Peters replied, "Yup. This is all my personal stuff." St. John explained, "my old lady kind of flung something on me last year, you know how that shit goes and I don't want to --," at which point Peters interjected, "Dude, get it cleaned off." Without providing identification, St. John then purchased from Peters a .34-caliber pistol and a 12-gauge shotgun.

St. John contacted Peters again on June 13 to ask about several of his guns, and told Peters that he would see him at the gun show the upcoming Saturday. At that show, on June 15, St. John said to Peters that gun shows made him "nervous as hell" because of his "damn felony conviction." Peters responded, "I thought that wasn't a conviction you said, they, they gave you a [inaudible] judgment you said." St. John then purchased two semi-automatic pistols from Peters, again without showing any identification, before returning to the topic of his trouble with his "old lady." Peters suggested that "it might be fixed by now," to which St. John replied, "They don't take that shit off." Peters assured him, "Yeah they do," and St. John told him, "A felony conviction, they don't do [sic] take that off." Peters commented, "I thought you said it was a domestic violence charge," and St. John

4

explained, "No, I said it was the old lady, you know what I mean. And it's bullshit, she Goddamn set up the -- all I did was grab that -- she's hauling ass out the door and I cut the Goddamn tire and they charged me with [inaudible]." Peters asked, "assault on a vehicle?" and St. John responded, "no -- on her." St. John also informed Peters that he had received the conviction three years earlier, in Georgia. Peters asked, "are you sure it was a felony conviction? . . . Cause I thought it was a domestic violence thing we were talking about before." St. John mentioned attempting to get his rights restored, and Peters advised him to "[p]ay a couple of hundred bucks to an [a]ttorney, fill out the paperwork, go through the procedures, it's worth it." Peters referred him to an attorney whom Peters said had helped an acquaintance of his get his rights restored after his conviction for a drug offense.

On June 26, 2002, St. John again called Peters to inquire about several more guns. Peters gave St. John directions to his store, and St. John mentioned that he had left a message for the attorney Peters had recommended. Two days later, on June 28, 2002, St. John visited Peters' store. St. John also mentioned again that he was having difficulty contacting the attorney, and explained that he wanted to follow up with her, because "[i]f she gets that felony conviction off of me then . . . I can do what the hell I want . . . [and] I don't have to worry about a bunch of bullshit." Peters suggested that St. John's offense "should have been a

5

misdemeanor in the first place." The two discussed St. John's conviction for several minutes, and then St. John purchased an AR-15 and a case of ammunition from Peters, again without showing identification.

Peters and St. John had no subsequent meetings. However, on September 17, 2002, ATF agents executed searches of both Peters' residence and his business premises. These searches turned up no illegal firearms or other contraband.

On December 18, 2002, a federal grand jury in the United States District Court for the Middle District of Florida indicted Peters on two counts of selling firearms and ammunition to a convicted felon -- on June 15, 2002, and June 28, 2002, respectively -- in violation of 18 U.S.C. §§ 922(d)(1) and 922(a)(2).

At trial, the government introduced transcripts of the conversations between Peters and St. John, all of which had been recorded. The government also introduced testimony from Matthew Scott Robinson, a local police officer working with ATF. Robinson testified that he was conducting surveillance at the June 15 gun show, and did not see St. John show Peters any identification before making his purchase.

Agent Cheremeta testified about the details of ATF's investigation of Peters. He explained, among other things, that ATF had instructed St. John to mention to Peters a possible problem with his background, but not to give any specifics until

the June 15 gun show. Cheremeta denied, however, instructing St. John to mislead Peters about his conviction. According to Cheremeta, when he ran a background check through the National Crime Information Center ("NCIC"), it revealed St. John's prior conviction. On cross-examination, however, Cheremeta admitted that he had conducted the NCIC search using St. John's birth name, Gary Wilson, and had not run the name St. John.

The government rested its case, and Peters moved for judgment of acquittal, arguing that the government had not established that Peters was aware of St. John's conviction. The court denied the motion.

Peters then testified on his own behalf. He explained that he let his federal firearms license expire in April 2001 because he had decided to close his store and become a mortgage broker. The defendant said that after the expiration of his license, he took his excess firearm inventory home to sell privately through trade shows and over the internet. He acknowledged that as a licensed firearms dealer, he had been required to conduct background checks of potential purchasers, but that no checks are required when the seller is a private individual.

Peters further testified that St. John had produced a Florida driver's license bearing the name Harley St. John when he made his initial firearm purchase from Peters on May 26, 2002. As to St. John's story about trouble with his wife, Peters

7

explained that he had assumed St. John was referring only to a domestic violence temporary restraining order. Peters also stated that after this conversation, he conducted a background check, using the name Harley St. John and the address and date of birth on the driver's license St. John had produced, to search public records available on the internet, including the web sites of the Georgia and Florida departments of corrections, the Bradford and Duval County sheriffs' offices, and the Georgia Bureau of Investigations. Peters found no record of any conviction under the name Harley St. John in any of these sources. He acknowledged that if he had been a licensed dealer, he would have checked other sites, including NCIC.

As to St. John's mention of a prior felony conviction at the June 15, 2002 gun show, Peters testified that he thought St. John was simply confused about a prior domestic violence restraining order and was making a big deal out of nothing. Peters stated that he would not have sold firearms to St. John if he had reason to believe that St. John had a prior felony conviction. Peters explained that St. John's confusion about the nature of the charges, what he had been convicted of, and whether he had served any jail time, as well as the fact that Peters' own searches had revealed no record of any conviction, led Peters to believe that St. John had no prior felony conviction.

Peters also offered the testimony of Charles Meacham, a licensed private

8

investigator familiar with conducting background checks. Meacham stated that he ran a check of Harley St. John on all available public databases and found no felony convictions. Meacham also confirmed that the NCIC database is not accessible by the public.

Peters called a final character witness to establish his reputation for truthfulness, and then rested his case. The government presented no rebuttal case. Peters then renewed his motion for judgment of acquittal, which the court denied. The jury acquitted Peters on the first count of the indictment -- the June 15 sale -- and convicted him on the second -- the June 28 sale. At sentencing, the district court granted Peters' motion for a downward departure from the Guidelines range, and sentenced him to three years' probation and nine months' home detention. Peters now appeals his conviction.

## II.

Peters' first argument on appeal is that the district court erred in denying his motion for judgment of acquittal, since the evidence presented at trial was legally insufficient to establish either that St. John actually had a prior felony conviction, or that Peters knew or had reasonable cause to know of such a conviction.

Federal Rule of Criminal Procedure 29(a) states, in pertinent part: "After the government closes its evidence or after the close of all the evidence, the court on

9

the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

We review the denial of a motion for judgment of acquittal de novo. United States v. Bowman, 302 F.3d 1228, 1237 (11th Cir. 2002). "When the motion raises a challenge to the sufficiency of the evidence, we review the sufficiency of the evidence de novo, drawing all reasonable inferences in the Government's favor." Id.; see also United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000). "To uphold the denial of a Rule 29 motion, 'we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt.'" United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002) (quoting United States v. Hansen, 262 F.3d 1217, 1236 (11th Cir. 2001)). The evidence may be sufficient even when it does not "exclude every reasonable hypothesis of innocence or [is not] wholly inconsistent with every conclusion except that of guilt," since a "jury is free to choose among reasonable constructions of the evidence." United States v. Montes-Cardenas, 746 F.2d 771, 778 (11th Cir. 1984) (citation and internal quotation marks omitted). Moreover, we are bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant. United States v. Glinton, 154 F.3d 1245, 1258 (11th Cir. 1998).

Title 18 U.S.C. § 922(d) states, in pertinent part: "It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person-- (1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . ." 18 U.S.C. § 922(d). Moreover, § 924(a)(2) provides: "Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." 18 U.S.C. § 924(a)(2). Accordingly, to prove its case against Peters for violating § 922(d)(1), the government needed to establish beyond a reasonable doubt (1) that Peters sold a firearm; (2) that the purchaser, St. John, was a convicted felon; and (3) that Peters knew or had reasonable cause to believe that St. John had a prior felony conviction. See 11th Cir. Pattern Jury Instruction (Criminal), 34.5.

Peters admits the first element -- that he sold a firearm -- but challenges the second and third. As to the second element, Peters contends that the government failed to establish beyond a reasonable doubt that Ed Feagin -- whose felony conviction the government introduced at trial -- was the same person as Harley St. John. As to the third element, Peters claims that the background check he performed on St. John, as well as St. John's apparent confusion regarding the

11

details of his conviction, establish that the government failed to prove beyond a reasonable doubt that Peters knew or had reason to believe that St. John was a convicted felon. We are persuaded by neither argument.

Regarding the second element of the offense -- that the purchaser is a convicted felon -- the government's evidence was more than sufficient for the jury to conclude, beyond a reasonable doubt, that Harley St. John and Ed Feagin are indeed the same person, and thus that St. John is in fact a convicted felon. St. John himself testified that he and the Ed Feagin named in the 1991 Georgia judgment of conviction for one count of felony aggravated assault introduced at trial are one and the same. Indeed, when the government introduced the judgment of conviction as its Exhibit 16, St. John identified it as his own conviction. Moreover, as Agent Cheremeta's trial testimony revealed, law enforcement records -- including the NCIC database -- list St. John and Feagin (along with St. John's other aliases, Gary Wilson, Bruce Wilson, and Charles Wilson) -- as being one person. Agent Cheremeta stated, all of these individuals are assigned the same FBI number. Moreover, Peters offered no evidence whatsoever to refute the evidential foundation that St. John and Feagin are the same person. Simply put, the jury could reasonably conclude that St. John's own acknowledgment, coupled with the testimony of Agent Cheremeta, established beyond a reasonable doubt that St. John

12

was indeed a convicted felon.

As to the third element of the offense -- whether Peters knew or had reasonable cause to believe that St. John was a convicted felon -- the jury's verdict was similarly supported by sufficient evidence. Tracking Eleventh Circuit Pattern Jury Instruction (Criminal) 34.5, the district court properly instructed the jury that "[t]o have 'reasonable cause to believe' that someone is a convicted felon means to have knowledge of facts which, although not amounting to direct knowledge, would cause a reasonable person, knowing the same things, reasonably to conclude that the other person was a convicted felon." The evidence indicating that Peters had such cause was ample.

Most significantly, St. John himself told Peters more than once that he had a prior felony conviction. St. John referred explicitly to his "felony conviction" at least three times during his interactions with Peters. First, at the June 15 gun show, St. John told Peters that gun shows made him nervous because of his "damn felony conviction." Specifically, St. John said that he had been convicted in Georgia of "assault" on his "old lady." During that same meeting at the gun show, St. John expressed his belief that his conviction could not be removed from his record, stating, "A felony conviction, they don't do [sic] take that off." Finally, during his June 28 visit to Peters' store -- immediately preceding the firearms sale for which

13

Peters was convicted -- St. John reiterated that "[i]f [the attorney] gets that felony conviction off of me then . . . I can do what the hell I want."

Moreover, Peters and St. John had extended conversations about St. John's conviction during both the June 15 gun show and St. John's June 28 visit to Peters' store. St. John repeatedly emphasized his desire to clear up his record, and Peters referred St. John to an attorney, explaining that she had helped an acquaintance of his get his rights restored after a drug conviction. In addition, even prior to stating outright that he was a convicted felon, St. John hinted at the problem with his criminal history, asking at the May 26 gun show whether Peters would sell him a firearm "without a background," and explaining that, "my old lady kind of flung something on me last year."

These exchanges -- including at least three explicit references by St. John to his "felony conviction" -- constitute sufficient evidence from which a reasonable jury could find that Peters had reasonable cause to believe that St. John had a prior felony conviction. Plainly, the jury was not required to believe Peters' trial testimony that he thought St. John was simply confused about the nature of his offense, that he had run a background check that confirmed his belief that St. John had no felony conviction, or even that he had seen St. John's Florida driver's license.

14

Assessing witness credibility is uniquely the function of the trier of fact, and it is one that a court of appeals may not and should not endeavor to replicate based on the cold paper record before it. As we have observed previously, "the jury, hearing [the defendant's] words and seeing his demeanor, was entitled to disbelieve [his] testimony and, in fact, to believe the opposite of what [he] said." United States v. Rudisill, 187 F.3d 1260, 1268 (11th Cir. 1999) (quoting United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995)) (emphasis removed). It is "the jury's prerogative to disbelieve" a defendant's testimony, United States v. Sharif, 893 F.2d 1212, 1214 (11th Cir. 1990), and we cannot say here that the jury's apparent disbelief of Peters' claimed unawareness of St. John's status as a convicted felon was unreasonable.

Moreover, even if the jury believed everything Peters said, it nevertheless could have concluded that Peters' multiple conversations with St. John about St. John's prior offense -- which St. John referred to repeatedly as a "felony conviction -- gave Peters knowledge of facts that "would cause a reasonable person, knowing the same things, reasonably to conclude that the other person was a convicted felon." 11th Cir. Model Jury Instruction (Criminal) 34.5. The jury may have simply concluded, based on the testimony and transcripts before it, that St. John's insistence that he did have a prior felony conviction would have led a

15

reasonable person to believe that he was in fact a convicted felon.

Again, a jury "is free to choose among reasonable constructions of the evidence," Montes-Cardenas, 746 F.2d at 778. Based on the evidence presented at trial, we cannot say that the jury's finding that Peters had reasonable cause to believe St. John was a convicted felon was anything other than reasonable. In short, we are bound to accept the jury's verdict and, accordingly, affirm the district court's denial of Peters' motion for judgment of acquittal.

## III.

Peters also challenges his conviction on the ground that § 922(d)(1) exceeds Congress' Commerce Clause power, since the statute regulates purely intrastate gun sales that individually have no substantial effect on commerce.

This is an argument that Peters has raised for the first time on appeal. Our review is therefore only for plain error. See, e.g., United States v. Walker, 59 F.3d 1196, 1198 (11th Cir. 1995) (explaining that defendant's failure to raise Commerce Clause challenge in the district court did not constitute a waiver of the argument, but that a party generally must timely object at trial to preserve the issue for appeal, and that unpreserved errors are reviewed only for plain error); United States v. Williams, 121 F.3d 615, 618 (11th Cir. 1997); United States v. Reynolds, 215 F.3d 1210, 1215 (11th Cir. 2000). "Under plain error review, which is authorized by

Fed. R. Crim. P. 52(b), federal appellate courts have only 'a limited power to correct errors that were forfeited because [they were] not timely raised in [the] district court.'" United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (quoting United States v. Olano, 507 U.S. 725, 731, 113 S. Ct. 1770, 1776, 123 L. Ed.2d 508 (1993)).  Thus, we "may not correct an error the defendant failed to raise in the district court unless there is: '(1) error, (2) that is plain, and (3) that affects substantial rights.'" Id. (quoting United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002)).  Even then, we will exercise our discretion to rectify the error only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (quoting Cotton, 535 U.S. at 631).

Because the sale of firearms to felons is an economic activity that substantially affects interstate commerce, we conclude that Congress acted within its commerce power in enacting § 922(d)(1), and thus that the district court committed no error in entering a judgment of conviction.

A.

We begin our review by recalling the important principle that "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." United States v. Morrison, 529 U.S. 598, 607, 120 S.

17

Ct. 1740, 146 L. Ed. 2d 658 (2000).  Accordingly, we are obliged to evaluate §

922(d) "[w]ith this presumption of constitutionality in mind."  Id.

The Commerce Clause, Article I, § 8 of the United States Constitution,

provides that "[t]he Congress shall have the Power . . . To regulate Commerce with

foreign Nations, and among the several States, and with the Indian Tribes."  U.S.

Const. art. I, § 8, cls. 1 & 3.

Contemporary Commerce Clause jurisprudence acknowledges "three broad

categories of activity that Congress may regulate under its commerce power."

United States v. Lopez, 514 U.S. 549, 558 (1995).  First, Congress is empowered

to "regulate the use of the channels of interstate commerce"; second, Congress

properly may "regulate and protect the instrumentalities of interstate commerce, or

persons or things in interstate commerce, even though the threat may come only

from intrastate activities"; and finally, Congress is authorized "to regulate those

activities having a substantial relation to interstate commerce, i.e., those activities

that substantially affect commerce."  Id. at 558-59; see also United States v.

Ballinger, 395 F.3d 1218, 1225-26 (11th Cir. 2005) (en banc) (discussing these

categories).  This third Lopez category, we have observed, "is the broadest

expression of Congress' commerce power."  Ballinger, 395 F.3d at 1226.

Our focus today is on this third category, since we have little trouble

18

concluding that the sale of firearms to felons directly and substantially affects interstate commerce.[1]  Accordingly, a brief synthesis of the precedents defining the contemporary contours of this class of Commerce Clause enactments is in order.

To determine whether the third Lopez prong will accommodate a particular congressional enactment, "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce."  Lopez, 514 U.S. at 559.  Recent Supreme Court precedent has identified four basic considerations that guide this inquiry.  These are (1) whether the regulated activity is commercial or economic in nature; (2) whether the statute contains an express jurisdictional requirement, capable of limiting its reach to a discrete set of cases; (3) whether the statute or its legislative history contains congressional findings articulating the effect of the regulated activity on interstate commerce; and (4) whether the activity's effect on commerce is direct, as opposed to attenuated.  See Morrison,

_____

[1]We need not and do not consider here whether § 922(d) might fall within another category of Congress' commerce power as well.  The Lopez categories do not carve the commerce power into three neat slices, but simply represent an effort to synthesize more than a century of Commerce Clause enactments by grouping them in loose categories that are decidedly descriptive, rather than definitional.  Consequently, it is often the case that more than one category will accommodate a given piece of legislation.  See, e.g., United States v. Haney, 264 F.3d 1161, 1168 n.2 (10th Cir. 2001) (observing that the courts of appeal have variously categorized 18 U.S.C. § 922(o), which prohibits possession of a machine gun, and noting that "the Lopez categories necessarily overlap to some extent"); Navegar, Inc. v. United States, 192 F.3d 1050, 1055 n.2 (D.C. Cir. 1999) ("[W]hile the categories are useful as a synopsis of the Supreme Court's Commerce Clause jurisprudence, the attempt to fit a regulation squarely within one category can prove elusive, even fruitless.").

529 U.S. at 610-12; see also United States v. Maxwell, 386 F.3d 1042, 1056 (11th Cir. 2004) (applying these factors).

The first case to employ these factors was United States v. Lopez, in which the Supreme Court invalidated the Gun Free School Zones Act of 1990, 18 U.S.C. § 922(q), prohibiting the possession of a firearm within a thousand feet of a school. In concluding that the Act exceeded the scope of Congress' commerce power, the Court first observed that "Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." Lopez, 514 U.S. at 561. Because the regulated activity was noneconomic in nature, the Court proceeded to determine whether the statute contained a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." Id. Finding no such provision, the Court looked next to whether the statute or its legislative history contained any "express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." Id. at 562 (citation and internal quotation marks omitted). Though not required, such findings, the Court noted, could provide a basis for upholding a statute "even though no such substantial effect was visible to the naked eye." Id. at 563. Uncovering no such findings in the legislative history of § 922(q), the Court finally considered whether gun possession in school zones

20

nevertheless affected commerce substantially enough to sustain the statute. To uphold the statute based on the government's proffered "costs of crime" rationale (i.e., guns near schools promote violent crime, which drains national economic resources), the Court reasoned, would be "to pile inference upon inference" -- something it was not willing to do. Id. at 567. Thus, in striking down § 922(q), the Lopez Court made clear that something tangible -- such as the commercial nature of the regulated activity or an express jurisdictional hook -- must tether the legislation to interstate commerce.

The Supreme Court reiterated the four Lopez factors in United States v. Morrison, applying them to invalidate Subtitle C of the Violence Against Women Act of 1994, 42 U.S.C. § 13981, which created a federal civil cause of action for victims of gender-motivated acts of violence. That statute, the Court observed, neither regulated economic activity nor contained an express jurisdictional element. It was, however, supported by extensive congressional findings articulating the effects of gender-motivated violence on the national economy. Morrison, 529 U.S. at 614. The problem the Court found with the congressional findings in that case, though, was that they were premised on the "costs of crime" rationale previously rejected in Lopez, and thus the link they established between domestic violence and interstate commerce was insufficiently direct. Id. at 615.

21

Domestic violence, the Court concluded, was "noneconomic, violent criminal conduct" that Congress could not regulate "based solely on that conduct's aggregate effect on interstate commerce." Id. at 617. The "suppression of violent crime and vindication of its victims," the Court observed, was the quintessential "example of the police power, which the Founders denied the National Government and reposed in the States." Id. at 618.

The Lopez approach enumerates four factors essential to judicial review of congressional Commerce Clause enactments. To date, neither the Supreme Court nor our Court has treated any one of these four Lopez/Morrison factors as dispositive. Morrison identified them as "significant considerations" that "contributed to our decision" in Lopez. Morrison, 529 U.S. at 609. Lopez suggests that the statutes most likely to fall within Congress' commerce power are those directly regulating economic activity or containing explicit jurisdictional hooks to ensure that they capture only conduct substantially affecting commerce. Moreover, Lopez teaches us that the absence of all four factors -- that is, when the regulated activity is noncommercial, the statute contains no jurisdictional requirement, Congress has made no findings, and the effects on commerce are attenuated -- indicates that Congress has strayed far enough out of the heartland of its commerce power that the statute's "presumption of constitutionality," id. at 607,

22

is likely overcome.

Moreover, although neither Lopez nor Morrison was such a case, both of those cases make clear that when the challenged statute regulates activity that is plainly economic in nature, no jurisdictional hook or congressional findings may be needed to demonstrate that Congress properly exercised its commerce power. Indeed, we have stated previously that "laws aimed directly at economic activity are most likely to satisfy the substantial effects test," since the regulation of economic activity occupies the very core of Congress' commerce authority. United States v. Olin Corp., 107 F.3d 1506, 1510 n.4 (11th Cir. 1997).

As Lopez acknowledged, the Supreme Court has "upheld a wide variety of congressional Acts regulating intrastate economic activity," based on its conclusion "that the activity substantially affected interstate commerce." Lopez, 514 U.S. at 559. Among the approved objects of regulation are intrastate coal mining, see Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 101 S. Ct. 2352, 69 L. Ed. 2d 1 (1981), intrastate extortionate credit transactions, see Perez v. United States, 402 U.S. 146, 91 S. Ct. 1357, 28 L. Ed. 2d 686 (1971), restaurants utilizing interstate supplies, see Katzenbach v. McClung, 379 U.S. 294, 85 S. Ct. 377, 13 L. Ed. 2d 290 (1964), inns and hotels accommodating interstate guests, see Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S. Ct. 348, 13 L.

23

Ed. 2d 258 (1964), and the cultivation of wheat for home consumption, see Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942). This list, Lopez observed, "is by no means exhaustive, but the pattern is clear": "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." Lopez, 514 U.S. at 560.

B.

Section 922(d) makes it a crime knowingly "to sell or otherwise dispose of any firearm or ammunition" to a convicted felon. § 922(d). Because the sale of firearms to felons is an economic activity that substantially affects interstate commerce, the first Lopez factor is a powerful indicator that Congress acted within its commerce power in enacting § 922(d).

Peters disputes the notion that the isolated firearm sale for which he was convicted under § 922(d) could possibly have had a substantial effect on interstate commerce. We therefore reiterate here what is by now abundantly clear: the proper inquiry is whether "the 'class of activities' involved in the case" -- not the individual instance of conduct -- substantially affects commerce. Olin, 107 F.3d at 1510. Lopez itself said this unambiguously, explaining that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce," Lopez 514 U.S. at 559 (emphasis added) -- not of whether

24

an individual instance of conduct prosecuted under the statute substantially affects commerce. The Court acknowledged numerous "cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." Id. at 561; see also id. at 559-60 (citing cases); id. at 558 ("[W]here a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." (emphasis omitted) (quoting Wirtz, 392 U.S. at 197 n. 27).

Morrison reinforced this point. While the Court cast real doubt on whether "aggregating the effects of any noneconomic activity" could establish a basis for sustaining a Commerce Clause enactment, 529 U.S. at 613 (emphasis added), it reaffirmed the Court's longstanding practice of "sustain[ing] federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce" when "the activity in question has been some sort of economic endeavor." Id. at 611; see also Perez, 402 U.S. at 154 ("Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." (quoting Maryland v. Wirtz, 392 U.S. 183, 193, 88 S. Ct. 2017, 20 L. Ed. 2d 1020 (1968))); Katzenbach, 379 U.S. at 301 (affirming Congress' power to reach an individual

25

instance of discrimination that "was but representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce" (citation and internal quotation marks omitted)).

Congress may appropriately exercise its commerce power when "the activity sought to be regulated is commerce which concerns more States than one and has a real and substantial relation to the national interest." Heart of Atlanta, 379 U.S. at 255 (internal quotation marks omitted). The sale of a firearm undoubtedly "is commerce" in its truest form, and the national nature of the market for firearms ensures that this commerce concerns all states, and that its relation to the national interest could hardly be more real or substantial. This much is clear not only from Supreme Court precedent, but also from the history of federal firearms legislation in general, and of § 922(d) in particular.

Section 922(d) has its origins in Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 225. Title IV established federal licensing requirements and other regulations on the nationwide traffic in firearms. Among these provisions was the predecessor to the current § 922(d), then codified as § 922(c), which stated, in pertinent part:

> It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person, knowing or having reasonable cause to believe that such person is a fugitive from justice or is under

26

indictment or has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year.

Congress made a number of specific findings explaining the need for the legislation. Section 901(a) declared "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." § 901(a)(1). Congress further found "that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles . . . , narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States." § 901(a)(2). Moreover, Congress determined "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." § 901(a)(3) (emphasis added).

Several months after Title IV of the Omnibus Crime Control and Safe Streets Act of 1968 was enacted, it was superseded by the Gun Control Act of

27

1968, Pub. L. No. 90-618, 82 Stat. 1213, which "was designed to strengthen the firearms provisions which had been enacted as part of the omnibus crime bill." H.R. Rep. No. 90-1577, reprinted in 1968 U.S.C.C.A.N. 4410, 4412; see also id. at 4413. The Gun Control Act left the Omnibus Act largely intact, with two significant changes: it imposed restrictions on rifles and shotguns generally parallel to those that the Omnibus Act applied to handguns only; and it added provisions controlling interstate shipment of ammunition and sale of ammunition to juveniles. See id. The ban on firearm sales to felons was recodified in nearly identical language, again as § 922(c).

Although Congress deemed it "unnecessary" to include the Omnibus Act's specific findings in the Gun Control Act, the legislative history to the Gun Control Act makes clear that the rationale remained precisely the same. The expanded statute's purpose was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." Id. at 4411.

The ban on firearm sales to felons was finally enacted in its current form as part of the Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449. The purpose of the amendment was to "close an existing loophole" by extending the ban, which previously applied only to federally licensed firearms

28

dealers, to "all persons who transfer a firearm." H.R. Rep. No. 99-495, reprinted in 1986 U.S.C.C.A.N. 1327, 1343, 1348. Accordingly, § 922(d) was enacted in its current form, which prohibits "any person" from knowingly selling a firearm to a felon.[2]

We have little doubt that Congress, recognizing the national nature of the economic market for firearms, acted within the bounds of its commerce authority in addressing the problem of the sale and distribution of firearms to felons through federal legislation. Morrison observed that "[t]he Constitution requires a distinction between what is truly national and what is truly local." Morrison, 529 U.S. at 617-18. Because of the ease with which Congress has explicitly found that firearms move across state lines, see, e.g., 18 U.S.C. § 922(q)(1)(C) (observing that

_____

[2]We look to the findings accompanying previous incarnations of this law in analyzing the current version, since § 922(d) "is closely intertwined with other federal gun legislation and . . . Congress should not be required to rearticulate its old findings every time it adds an additional provision." United States v. Haney, 264 F.3d 1161, 1169 n.3 (10th Cir. 2001) (referring to legislative history accompanying other federal gun legislation in upholding 18 U.S.C. § 922(o), banning possession and transfer of machine guns). Accord Navegar, Inc. v. United States, 192 F.3d 1050, 1065 (D.C. Cir. 1999) (agreeing with numerous other circuits that "have held that the subject matter of [the Firearms Owner Protection Act of 1986] is sufficiently similar to previous firearms legislation to render appropriate the importation of prior legislative findings as a reliable statement of Congress' intent in passing FOPA"). But see United States v. Stewart, 348 F.3d 1132, 1139-40 (9th Cir. 2003) (departing from the otherwise-uniform view of the courts of appeals, and declining to consider the legislative history of any other firearms statutes in reviewing § 922(o)). Section 922(d) is clearly distinguishable from the Gun-Free School Zones Act in that rather than "plow[ing] new ground and represent[ing] a sharp break with the long-standing pattern of federal firearms legislation," Lopez, 514 U.S. at 563 (citation and internal quotation marks omitted), § 922(d) explicitly builds upon -- in order to close a loophole in -- a version of the statute in existence since 1968. Consideration of the earlier legislative history, then, is altogether appropriate.

"firearms and ammunition move easily in interstate commerce"); id. § 922(q)(1)(D) (noting that "even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce"), regulation of the purchase and sale of firearms is an appropriate object of federal regulation. Cf. United States v. Wright, 117 F.3d 1265, 1269-71 (11th Cir. 1997) (upholding 18 U.S.C. § 922(o), which prohibits possession and transfer of machine guns, on the ground that "[t]he regulation of purely intrastate possession of machineguns constitutes an appropriate element of [§ 922(o)'s] broader scheme to reduce substantially the trade in machineguns" (citation and internal quotation omitted)), rev'd on other grounds, 133 F.3d 1412 (11th Cir. 1998); United States v. Bailey, 123 F.3d 1381, 1392-93 (11th Cir. 1997) (reaffirming Wright); Olin, 107 F.3d at 1510, 1511 (upholding CERCLA's regulation of interstate waste disposal as "an appropriate element of Congress's broader scheme to protect interstate commerce and industries thereof from pollution," since "the unregulated management of hazardous substances, even strictly within individual states, significantly impacts interstate commerce").

Our sister circuits have repeatedly upheld other pieces of federal firearms legislation based on the national character of the market for firearms. See, e.g.,

United States v. Haney, 264 F.3d 1161, 1169 (10th Cir. 2001) (upholding 18 U.S.C. § 922(o), which bans the possession or transfer of a machine gun, and finding "no question that the market in firearms generally is heavily interstate -- indeed, international -- in character"); Navegar, Inc. v. United States, 192 F.3d 1050, 1063 (D.C. Cir. 1999) (upholding 18 U.S.C. § 922(v), the now-invalid assault weapons ban, based on "the widely accepted knowledge that there is a vast interstate market in firearms that makes the states unable to control the flow of firearms across their borders or to prevent the crime inevitably attendant to the possession of such weapons once inside their borders"); United States v. Cardoza, 129 F.3d 6, 11-13 (1st Cir. 1997) (upholding 18 U.S.C. § 922(x), which prohibits the sale or transfer of handguns and ammunition to juveniles, as a regulation of the "national juvenile market in handguns"); United States v. Wilks, 58 F.3d 1518, 1521 (10th Cir. 1995) (upholding § 922(o) as a regulation of the "extensive, intricate, and definitively national market for machineguns" (citation and internal quotation marks omitted)).

The efficacy of a congressionally enacted federal ban on the sale of firearms to felons -- a supply-side restriction -- is reinforced by the codification of a complementary demand-side restriction prohibiting felons from possessing firearms. Title 18 U.S.C. 922(g)(1), whose constitutionality has been repeatedly

31

upheld, see, e.g., Scarborough v. United States, 431 U.S. 563, 572, 97 S. Ct. 1963, 52 L. Ed. 582 (1977) (upholding 18 U.S.C. § 1202(a), the predecessor statute to 18 U.S.C. § 922(g)); United States v. McAllister, 77 F.3d 387, 389 (11th Cir. 1996) (reaffirming the constitutionality of § 922(g) after Lopez); United States v. Dupree, 258 F.3d 1258 (11th Cir. 2001) (reaffirming the constitutionality of § 922(g) after Morrison), prohibits felons from "possess[ing] in or affecting commerce" any firearm.

As the Supreme Court has explained, in imposing this ban, "Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." Scarborough v. United States, 431 U.S. 563, 572, 97 S. Ct. 1963, 52 L. Ed. 582 (1977) (citation and internal quotation marks omitted). We have observed previously that "[w]hen viewed in the aggregate, a law prohibiting the possession of a gun by a felon stems the flow of guns in interstate commerce to criminals." McAllister, 77 F.3d at 390.

Section 922(d) is the flip side of this coin. By targeting the available supply of firearms to felons (the ban on sales), as well as the lawful demand for firearms among felons (the ban on possession), Congress has created a mutually reinforcing regulatory framework. Moreover, because § 922(g) reaches only instances of

32

possession "in or affecting commerce," Congress intended § 922(d) "to reach transactions that are wholly intrastate . . . on the theory that such transactions affect interstate commerce," Huddleston v. United States, 415 U.S. 814, 833, 94 S. Ct. 1262, 39 L. Ed. 2d 782 (1974) (citation and internal quotation marks omitted), and thus to supplement § 922(g), see Barrett v. United States, 423 U.S. 212, 218-19, 96 S. Ct. 498, 46 L. Ed. 2d 450 (1976) (observing that Congress intended for these subsections to complement each other); United States v. Winchester, 916 F.2d 601, 606 (11th Cir. 1990) (same).  Simply put, § 922(d) is permissible as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated."  Lopez, 514 U.S. at 561; see also § 922(a)-(y) (creating a comprehensive federal firearms regulatory scheme).

Finally, we observe that this case is readily distinguishable from Lopez.  The sale or distribution of firearms to felons -- even when the sales are carried out inside the borders of a single state -- are commercial transactions invariably occurring within a national firearms marketplace.  In contrast, the purely possessory offense of carrying a firearm within a thousand feet of a school is, by its very terms, a localized activity whose impact is felt within a limited geographic sphere, and whose regulation falls within the general police powers reserved to the

33

state. As we have observed previously, "[b]y prohibiting only the possession of guns within 1,000 feet of a school, Congress could not rationally have expected to substantially affect the manufacture, importation, and interstate transfer of firearms." Wright, 133 F.3d at 1270 n.8 (finding Lopez "easily distinguishable" from a case challenging § 922(o), which bans possession of machine guns); see also Haney, 264 F.3d at 1170 (observing that the Gun-Free School Zones Act "restrict[ed] only the location in which a transfer could take place by restricting gun possession at that location, and therefore it has a much more attenuated connection to commercial transactions" than § 922(o)).

In contrast, selling a firearm to a felon is "an economic activity that might, through repetition elsewhere, substantially affect . . . interstate commerce." Lopez, 514 U.S. at 567. Accordingly, § 922(d), unlike the Gun-Free School Zones Act, can "be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce."[3] Id. at 561.

---

[3]Peters argues that we cannot sustain a statute that contains no jurisdictional element to ensure, case by case, that the conduct regulated substantially affects commerce. However, a panel of this Court has already "rejected the argument that Lopez requires Congress to place a jurisdictional element in every statute enacted pursuant to the Commerce Clause or to make formal legislative findings connecting the regulated activity to interstate commerce." Wright, 117 F.3d at 1269 (citing Olin, 107 F.3d at 1510). Lopez explained that "a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce," even when no such relationship is evident from the nature of the regulation itself. Morrison, 529 U.S. at 612. Because sales of firearms to felons are commercial transactions that,

34

We therefore join the Eighth Circuit -- the only other court of appeals to address this question -- in upholding § 922(d) as a valid exercise of Congress' commerce power over the economic activity of distribution and sale of firearms nationwide. See United States v. Monteleone, 77 F.3d 1086, 1091-92 (8th Cir. 1996).

IV.

Because the evidence presented at trial was sufficient for a reasonable jury to find all the elements of a violation of § 922(d)(1), we AFFIRM the district court's denial of Peter's motion for judgment of acquittal. Moreover, because Congress acted within its commerce power in enacting § 922(d)(1), the district court committed no error, let alone plain error, and we AFFIRM the conviction.

**AFFIRMED.**

---

as a class, substantially affect interstate commerce, the requisite relation to interstate commerce may be established without the case-by-case inquiry that a jurisdictional element would entail.