[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10188
_____

D.C. Docket No. 8:11-cr-00269-SDM-AEP-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS ANGEL LOPEZ,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 9, 2014)

Before PRYOR and MARTIN, Circuit Judges, and GOLD,[*] District Judge.

PER CURIAM:

Luis Angel Lopez appeals his conviction for the murder of Thomas Lee

Sehorne after Mr. Sehorne's wife and her boyfriend hired Lopez to kill Mr.

_____
[*] Honorable Alan Stephen Gold, United States District Judge for the Southern District of Florida, sitting by designation.

Sehorne for the proceeds of a life insurance policy. 18 U.S.C. § 1958(a). Lopez challenges the denial of his renewed motion for a judgment of acquittal and motion for a new trial. Because the United States presented ample evidence to support Lopez's conviction and the credibility of that evidence was for the jury to decide, we affirm.

## I.  BACKGROUND

In 2005, Cristie Sehorne and Jerry Bottorff met at a swingers club named the "Pleasure Palace" in Tampa, Florida. Mrs. Sehorne, who later became Mrs. Bottorff, frequented the club with her then-husband, Thomas Lee Sehorne, to swap partners with other couples. Mrs. Sehorne became acquainted with Bottorff because he worked at the front desk of the club, and the two began a relationship. Mr. Sehorne, who often worked out of town for weeks on a tugboat on the Great Lakes, was aware of their relationship. He even gave his permission to Bottorff.

Mrs. Sehorne and Bottorff continued to date, and Mrs. Sehorne eventually decided that she wanted to be with Bottorff exclusively. But Mrs. Sehorne depended on Mr. Sehorne financially, and Bottorff did not make enough money to support her and her two children. So Mrs. Sehorne and Bottorff hatched a scheme to murder Mr. Sehorne for $1 million in benefits from his life insurance policy. At first the two discussed the idea in jest, but the discussions later became serious.

2

Bottorff approached Michael Garcia, a friend of his from the Pleasure Palace, about murdering Mr. Sehorne. Garcia, a career criminal, was once a high-ranking officer in the Latin Kings gang. Garcia has prior convictions for distributing narcotics, possession of a firearm as a felon, possession of ammunition, burglary, grand theft, and possession of burglary tools. In total, Garcia has 15 federal convictions and 10 state convictions.

Garcia was often at the Pleasure Palace to sell drugs, and he became friends with Bottorff and Mrs. Sehorne. Eventually, Bottorff approached Garcia about "tak[ing] care" of Mr. Sehorne for him. Garcia replied that he could probably arrange something. He eventually agreed to find someone to murder Mr. Sehorne for $60,000, and Bottorff and Garcia met several times after that, sometimes with Mrs. Sehorne and sometimes without her. The couple frequently met with Garcia in his driveway to discuss their plans so that Garcia's family would not be privy to the conversations.

Garcia played the role of the "middle man," whose task was to find someone to commit the murder. There was conflicting testimony at trial as to whether Garcia ever planned to commit the murder himself, but it was undisputed that both Mrs. Sehorne and Bottorff eventually became aware that someone other than Garcia would commit the murder. Garcia planned with Mrs. Sehorne and

3

Bottorff to have Mr. Sehorne murdered "whenever it was possible," but the conspirators never set a deadline.

Garcia eventually included Lopez, who he knew from the Latin Kings and with whom he had burgled a beauty shop in 2007, in the scheme to murder Mr. Sehorne. Lopez, also known as "Proof," was at Garcia's home one day when Mrs. Sehorne and Bottorff arrived to discuss murdering Mr. Sehorne. Mrs. Sehorne and Bottorff remained in the front yard, and Lopez remained inside the house. When Lopez later asked about the couple, Garcia explained who they were and what they wanted, and Lopez then offered to commit the crime for $60,000.

Garcia and Lopez's first attempt to murder Mr. Sehorne failed. They knew from Mrs. Sehorne that Mr. Sehorne often took smoke breaks near a trampoline in the Sehornes' yard, so they hid behind trees and waited for Mr. Sehorne to take a smoke break for approximately an hour or an hour and a half. Lopez held the gun, which was an 80-year-old .38 revolver owned by Garcia, and the same weapon that Lopez later used to commit the murder. But Mr. Sehorne never emerged from the house, and Garcia and Lopez fled when neighborhood dogs started barking.

In the early hours of June 7, 2007, Garcia and Lopez returned to the Sehornes' home, and Lopez murdered Mr. Sehorne. They knew from Mrs. Sehorne that Mr. Sehorne would be transporting a friend from the airport at night and that he would be home late. They left Garcia's house around midnight, and they carried

4

the same .38 revolver that they had taken during the first murder attempt. When they arrived at the Sehornes' home, Garcia acted as the lookout and Lopez was "the trigger man." At Lopez's trial, Garcia testified that he hid behind a burn pile in the yard to keep watch for Mr. Sehorne's truck. For his part, Lopez hid under a van in the carport and waited for Mr. Sehorne to return home.

Garcia had never tested the revolver to see if it would shoot. He also knew nothing about Lopez's ability to shoot a gun. And Garcia knew not whether the ammunition in the gun would fire.

When Mr. Sehorne arrived around 1:15 or 1:30 a.m., he parked under the carport. He then left the truck and walked toward the house. Garcia testified at trial that he could not see what happened next, but he heard an unknown voice say, "Oh God, no," and heard two gunshots. Garcia and Lopez then ran back to the car, and Lopez drove them back to Garcia's garage, where they cut off the barrel of the revolver with bolt cutters in an attempt to render the gun unidentifiable. Later that night, after Lopez had returned home, Garcia drove to a nearby river and threw the gun and the shoes that the two men had worn into the water. He also disposed of the clothes that they had worn by dropping them in a nearby trash bin.

Garcia spoke with Lopez several times after the murder, and phone records established frequent calls between their phones near the time of the murder. The records proved calls between the phones on June 6, 2007, at 11:28 p.m., and on

5

June 7, 2007, at 12:36 a.m. and 12:44 a.m. The next call between the phones was at 3:12 a.m, and Garcia testified at Lopez's trial that Lopez had called him after returning home from the murder. He also spoke with Lopez on the phone several times over the next couple of days, but they never discussed the murder. Lopez later called Garcia to inform him that the newspaper had run a story about the murder. And Lopez discussed his payment with Garcia about a week after the murder, with several additional conversations on that topic.

About a year later, police officers arrested Garcia for crimes unrelated to the murder of Mr. Sehorne. Garcia cooperated with the police, and he informed them of his involvement in the murder of Mr. Sehorne, including where he had disposed of the murder weapon. He cooperated for roughly two years before he entered a plea agreement for Mr. Sehorne's murder. As part of his cooperation, he helped law enforcement gather enough evidence to arrest Mrs. Sehorne and Bottorff. He also informed law enforcement of Lopez's involvement in the murder.

When a federal grand jury returned an indictment charging Lopez with three offenses, Garcia had already pleaded guilty, and Mrs. Sehorne and Bottorff pleaded guilty soon afterward. The United States charged Lopez with the use of a facility of interstate commerce to commit the murder-for-hire of Mr. Sehorne, 18 U.S.C. § 1958(a); *id.* § 2; conspiring to use a facility of interstate commerce to commit the murder-for-hire, 18 U.S.C. § 1958(a); *id.* § 2; and knowingly using and

carrying a firearm in furtherance of the murder-for-hire, 18 U.S.C. § 924(c), (j)(1). Lopez pleaded not guilty and proceeded to trial.

The United States presented Garcia as the key witness in its case against Lopez. Garcia testified that Bottorff and Mrs. Sehorne met Lopez at one point, but that they did not discuss anything related to the murder. On cross-examination, Lopez's defense attorney attempted to refresh Garcia's recollection that he had told law enforcement officers in 2008 that Lopez was present for two meetings with Mrs. Sehorne and Bottorff to discuss the murder, but Garcia did not recall that statement. Garcia also testified that he hid by a burn pile during the murder of Mr. Sehorne. But on cross-examination, Lopez's defense attorney asked Garcia whether he had told law enforcement in 2008 that he hid under the trampoline, not the burn pile. Garcia testified that he did not remember that statement either. Garcia also testified that, at first, both he and Lopez had their cell phones the night of Mr. Sehorne's murder, but that "I think, if I'm not mistaken, [Lopez] took [his phone] back to his—the mother of his children[, Nina Torres]." He also testified that Lopez had used Garcia's cell phone that night to talk with Torres on the phone that Lopez gave to her. Finally, Garcia testified that he never stood to gain anything from Mr. Sehorne's murder and that he became involved only to help his friends.

Bottorff also testified for the United States. He testified that he could not remember whether he had ever met Lopez, but that they might have met in passing at Garcia's house. Bottorff also testified that he had been unaware of who murdered Mr. Sehorne until Garcia told him that it had been "Proof" when Garcia was cooperating with law enforcement in 2008. And although Garcia had attempted to collect money from Bottorff after the murder, Bottorff testified that Lopez had never once tried to collect money from him.

The United States called three jailhouse informants to testify against Lopez: Christopher Brown, Antonio Harris, and Marquis Bruce. Brown and Harris had both roomed with Lopez at the Pinellas County Jail, and Bruce knew Lopez from playing basketball together. Brown testified that Lopez told him about the murder of Mr. Sehorne and bragged about his specialty, "dome check[ing]"—that is, shooting victims in the head. Brown also testified that Lopez told him that he had committed the murder for a large sum of money that he never received and that he had used a .38 revolver. Harris testified to nearly identical details of the murder, but added that Lopez told him that he and Garcia had planned to split $100,000, and that the payment was to come from "a lady named [Mrs. Sehorne] and her boyfriend." Bruce testified that he had heard Lopez claim to specialize in "dome check[ing]," and that he had received $60,000 for his last "hit." Counsel for Lopez thoroughly cross-examined the informants and asked whether they would receive

8

reduced sentences for testifying. He also asked two of the informants whether they had ever read any newspaper articles about Mr. Sehorne's murder.

The United States also called Thomas Pettis, a homicide detective. When Detective Pettis interviewed Lopez about the Sehorne murder, Pettis asked Lopez about his relationship with Garcia, and Lopez informed him that they were friendly and that Garcia had worked on his car. When Pettis asked whether he had ever participated in a murder, whether he had heard of Mrs. Sehorne or Bottorff, and whether he had participated in the murder of Mr. Sehorne, Lopez responded in the negative. Pettis also testified that, when he interviewed Garcia, Garcia told him that he had hidden under a trampoline, not a burn pile, during the murder. And Pettis testified that Garcia told him that Lopez had been present at one or two of the meetings with Mrs. Sehorne and Bottorff.

The United States rested its case after offering several additional witnesses, and Lopez moved for a judgment of acquittal. Fed. R. Crim. P. 29. The district court denied the motion.

Lopez then called witnesses, including Nina Torres, a former girlfriend of Lopez and the mother of his children. Torres testified that she read a newspaper article about the murder, which gave the details of the murder and stated that Lopez had committed a murder for Mrs. Sehorne for $60,000. She also testified that she had the same cellular phone number from 2003 to 2011 and that she had

never needed Lopez's phone for any reason. She explained that her phone was always in service because her mother paid her phone bill.

After Lopez rested, the jury returned a verdict of guilty on all counts. Lopez timely renewed his motion for judgment of acquittal, Fed. R. Crim. P. 29, and moved in the alternative for new trial, Fed. R. Crim. P. 33. Lopez contested the sufficiency of the evidence and argued that the witnesses who testified against him were not credible and that cell phone records proved that several phone calls between his phone and Garcia's phone occurred near the time of the murder. After a hearing, the district court denied the motion.

## II. STANDARDS OF REVIEW

Two standards of review cover this appeal. First, we review the denial of a motion for judgment of acquittal *de novo*, and we view the evidence in the light most favorable to the United States to determine whether a reasonable jury could have found beyond a reasonable doubt that the defendant was guilty. *United States v. Yates*, 438 F.3d 1307, 1311–12 (11th Cir. 2006) (en banc); *Butcher v. United States*, 368 F.3d 1290, 1296–97 (11th Cir. 2004). This standard is comparable to the standard we apply when a defendant challenges the sufficiency of the evidence to support his conviction. *United States v. Ellington*, 348 F.3d 984, 989 (11th Cir. 2003). Second, we review the denial of a motion for new trial on the ground that

the verdict was contrary to the weight of the evidence for clear abuse of discretion. *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985).

## III. DISCUSSION

Lopez argues that the evidence at trial was insufficient to support his convictions and that his convictions were against the great weight of the evidence. For the charges that Lopez used a facility of interstate commerce to commit murder-for-hire, 18 U.S.C. § 1958(a), and conspired to use a facility of interstate commerce to commit the murder-for-hire, *id.*, the United States had to prove beyond a reasonable doubt that Lopez did or conspired to use or cause another to use any facility of interstate or foreign commerce with the intent that a murder be committed as consideration for a promise or agreement to pay anything of pecuniary value, *id.* And for the charge that Lopez knowingly used and carried a firearm in furtherance of a murder-for-hire, 18 U.S.C. § 924(c), the United States had to prove that Lopez committed a murder-for-hire in violation of section 1958(a) and that he used or carried a firearm in the furtherance of that crime. 18 U.S.C. § 924(c)(1)(A)(iii), (j)(1).

Lopez's arguments fail. A reasonable jury could have found beyond a reasonable doubt that Lopez was guilty of each count. And the district court did not abuse its discretion when it denied his motion for a new trial.

11

We will affirm the denial of a motion for a judgment of acquittal if a reasonable jury could find that the evidence established the defendant's guilt beyond a reasonable doubt. *United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . . A jury is free to choose among the constructions of the evidence." *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997) (quoting *United States v. Hardy*, 895 F.2d 1331, 1334 (11th Cir. 1990)). The United States may rely upon the testimony of "an array of scoundrels, liars and brigands" because the jury is free to disbelieve witnesses. *Id.* at 1325 (internal quotation marks omitted). "It is well established that credibility determinations are the exclusive province of the jury." *Id.* (internal quotation marks and alterations omitted).

When a defendant argues that the jury based his conviction on inconsistent or contradictory testimony, the defendant must establish that the testimony was "incredible as a matter of law." *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) (internal quotation marks omitted). "For testimony of a government witness to be incredible as a matter of law, it must be unbelievable on its face," meaning the witness must testify to "facts that [he] physically could not have possibly observed or events that could not have occurred under the laws of nature." *Calderon*, 127 F.3d at 1325. A witness's testimony is not incredible as a matter of

law even if the witness "has consistently lied in the past, engaged in various criminal activities, [or] thought that his testimony would benefit him." *Id.*

Lopez complains about the credibility determinations made by the jury, but we will not second-guess those findings. *Id*. For example, Lopez argues that Garcia's testimony had "inherent logical flaws" because a career criminal like Garcia would not have participated in a murder for no gain, would not have chosen a 19-year-old member of the Latin Kings to commit the murder, would not have selected an untested 80-year-old revolver for the murder, and would not have taken responsibility for disposing of the weapon. But it was for the jury to decide whether these alleged flaws in Garcia's testimony damaged his credibility at trial, and we cannot reweigh that evidence on appeal. *See Peters*, 403 F.3d at 1268; *Calderon*, 127 F.3d at 1325.

Lopez also argues that Garcia's statements to Detective Pettis in 2008 that he hid under the trampoline during the murder and that Lopez was present at meetings with Mrs. Sehorne and Bottorff were inconsistent with his trial testimony. But the jury was entitled to believe Garcia despite these and any other inconsistencies. Although Garcia was less than an ideal witness, his testimony was not "so contrary to the teaching of basic human experience" that no reasonable trier of fact would believe it beyond a reasonable doubt. *United States v. Chancey*, 715 F.2d 543, 546 (11th Cir. 1983).

13

Lopez makes similar arguments about documentary evidence, but the issues he raises were for the jury to decide. Lopez contends that phone records undercut Garcia's testimony that the men were together that night and that a newspaper article about the murder renders the testimony of all three jailhouse informants unreliable. But Garcia testified that he believed Lopez had given his phone to Torres, and the jury was entitled to credit his testimony. In addition, two of the jailhouse informants testified that they did not ordinarily read the newspaper and that they had not read any articles about Lopez, and Lopez's attorney failed to ask the third informant, Bruce, whether he had read the newspaper article. The jury again was entitled to believe the informants. *See Peters*, 403 F.3d at 1268.

The evidence that the United States presented at trial was more than sufficient to prove Lopez's guilt. Garcia testified in great detail about his relationship with Lopez and how the murder took place. Three jailhouse informants testified that Lopez bragged about his crime and how he "dome check[ed]" people and earned money for murders. Detective Pettis testified that Lopez misrepresented the extent of his relationship with Garcia. And Garcia informed Mrs. Sehorne and Bottorff that "Proof" had committed the murder. Based on this evidence, a reasonable jury could have found beyond a reasonable doubt that Lopez was guilty. *See Butcher*, 368 F.3d at 1296–97. None of the evidence presented at trial was "incredible as a matter of law." *Flores*, 572 F.3d at 1263.

14

We also conclude that the district court did not clearly abuse its discretion when it denied Lopez's motion for a new trial. Motions for new trial are disfavored, and we have directed that district courts grant them "only in those really exceptional cases," when "[t]he evidence . . . preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Martinez*, 763 F.2d at 1313 (internal quotation marks omitted). We agree with the United States that "this is not one of those exceptional cases" in which we should permit a new trial. The district court did not clearly abuse its discretion when it concluded that the verdict was not contrary to the great weight of evidence.

## IV. CONCLUSION

We **AFFIRM** the convictions of Lopez.