United States Court of Appeals,

Eleventh Circuit.

No. 94-3540.

UNITED STATES of America, Plaintiff-Appellee,

v.

Sonny James MIKELL, William Dee Young, and Samuel Lee Langston, Defendants-Appellants.

Dec. 30, 1996.

Appeals from the United States District Court for the Middle District of Florida. (No. 94-133-CR-T-21C), Ralph W. Nimmons, Jr., Judge.

Before TJOFLAT and COX, Circuit Judges, and VINING[*], Senior District Judge.

VINING, Senior District Judge:

This appeal presents the question of whether an arrestee's refusal to answer certain questions during a custodial interrogation constitutes an assertion of his Fifth Amendment right to remain silent. The district court denied a suppression motion which alleged that continuation of the custodial interrogation was unconstitutional. We affirm the district court's ruling on this issue, although we vacate the sentence and remand for resentencing. We also affirm all of the subject convictions despite the warrantless search which resulted in suppression motions.

I. FACTUAL BACKGROUND

In April 1994, law enforcement officials received an anonymous tip that defendants-appellants Sonny James Mikell, William Dee Young, and others were involved in the sale of crack cocaine in

---

[*]Honorable Robert L. Vining, Jr., Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

Sarasota, Florida.  On May 11, Detective Bourdeaux of the Sarasota County Sheriff's Office received another anonymous tip from a telephone caller.  The caller stated that later that evening, Young, Mikell, and Guss Terrance Jackson[1] would be buying $5,000 of powder cocaine to make into crack cocaine.  The tipster gave details about the source of the money for the purchase, saying that the $5,000 was located in a safe in the bedroom of Young's mother.  In addition, the tipster noted that, later in the evening, in a car usually used by Young, the defendants would be moving the cocaine to an apartment where they would then cook the cocaine powder into crack cocaine.  Detective Bourdeaux and other authorities believed that the tipster was credible and that the information she gave was accurate because they were able to verify certain portions of it.

Detective Bourdeaux and Detective Solek arrived at the subject apartment at 9:30 p.m. on May 11 to conduct surveillance.  At about 11:50 p.m., the detectives saw a white Ford Thunderbird approach and drive into the apartment complex.  After the car stopped, two persons exited the vehicle.  One of the individuals was carrying a duffle bag.  A third person approached the other two men, and all went into the apartment which had previously been identified by the tipster.

About twenty minutes later, an individual exited the apartment and walked out of sight.  Moments later, another person, subsequently identified as defendant-appellant Samuel Lee Langston, left the apartment complex in the Thunderbird and drove to a nearby

---

[1]Although Jackson was indicted along with Mikell, Young, and Langston, the jury acquitted him.

grocery store.  Detective Solek followed Langston into the store and observed his purchasing a large box of baking soda, an ingredient commonly used to convert cocaine powder into cocaine base.  Langston eventually drove back to the apartment complex with the baking soda.  Approximately one hour later, the two detectives saw three persons leave the apartment.  The officers believed that a fourth person remained inside the apartment.  As the three men came down a stairway, Detective Bourdeaux could see that one of the men was carrying a duffle bag.  All three of the men subsequently left the apartment complex in the Thunderbird.

A short distance from the complex, several police vehicles commenced pursuing the car with their lights activated.  Two police cars blocked the roadway.  The Thunderbird, travelling at an estimated eighty-five miles per hour in an effort to avoid being stopped by the police, began to weave.  Sergeant Bell and the others who were pursuing the defendants noticed that plastic bags were being thrown out of the passenger-side window of the car. Detectives Bourdeaux and Solek saw Sergeant Bell along the roadside.  Sergeant Bell told them that bags of cocaine had been thrown from the car and that an occupant of the car had been seen talking on a cellular phone.  Detective Solek assisted Sergeant Bell in gathering the bags that had been strewn along the side of the road.  They found two bags which contained a white powdery substance and numerous chunks of apparent crack cocaine along the roadway.  It was later determined that one of the bags contained cocaine hydrochloride, one contained baking soda, and one contained benzocaine, another ingredient used in the manufacture of cocaine

base.

Eventually, after it rammed into one of the patrol cars, the Thunderbird stopped. Four people, Young, Mikell, Langston, and Jackson, were in the car at the time of the stop. Young was talking on the cellular phone. Inside the car, the officers discovered two grams of cocaine, a scale, benzocaine, and a cellular phone. The cocaine was scattered throughout the car.

According to Detectives Bourdeaux and Solek, they thereafter returned to the apartment, at Sergeant Bell's direction, to conduct a "security sweep" to assure that no one who might destroy evidence remained in the apartment. Sergeant Bell claims, however, that he merely instructed the detectives to return to the apartment complex to "secure" the apartment while a search warrant was obtained. In any event, upon returning to the apartment, the detectives heard a clanging noise within the apartment and forced the door open. Once inside, they noticed numerous glass pyrex beakers that contained what appeared to be crack cocaine in the process of being cooked. The bottoms of the beakers contained what seemed to be "cookies" of crack cocaine, with water or some other fluid floating above. A chemist later determined that the beakers contained 291.5 grams of 56% cocaine base. The detectives allegedly searched only those areas of the apartment that could conceal a person. They subsequently determined that the clanging noise was actually being generated by an air conditioner in the apartment.

Detective Bourdeaux later met with another detective at the station. That detective gave Bourdeaux a set of keys and told him that the keys had been found in Young's pocket. Detectives

Bourdeaux and Solek interviewed each of the defendants at the station. The detectives interviewed Mikell for approximately ten minutes. After Solek read Mikell his *Miranda* rights, Mikell indicated that he understood his rights and that he wanted to talk. Mikell admitted that he had been driving the car, and he identified each of the individuals in the car. He stated that he had attempted to elude authorities because he thought that there might be drugs in the car. Detective Solek then confronted Mikell with the fact that they had discovered cocaine and cocaine paraphernalia in the apartment. Mikell did not respond. At several other times during the interview, Mikell also indicated that he would not answer particular questions. He never explicitly indicated, however, that he wanted the questioning to cease or that he wanted an attorney to be present. Mikell admitted that he had taken the beakers into the apartment and that the cocaine found in the apartment was the only cocaine that the defendants had.

In the meantime, based on the tip, the observations of the detectives before the investigatory stop of the car, the attempt of Mikell, Young, Langston to destroy evidence, the drugs discovered in the car, and the observations of the detectives during the "protective sweep" of the apartment, Detective Bourdeaux prepared an affidavit to be submitted to the court in support of an application for a search warrant for the apartment. The police officers obtained a search warrant and subsequently found twelve beakers containing suspected crack cocaine, a waste basket containing an empty box of baking soda, several zip-lock baggies and other containers that contained suspected cocaine residue,

mirrors with suspected cocaine residue on them, two buffet ranges that had suspected cocaine residue on them, scales, coffee pots containing suspected cocaine residue, and a container of razor blades. Young's fingerprints were subsequently found on one of the mirrors and on several of the beakers, and Mikell's fingerprints were also discovered on several of the beakers.

In July 1994, the Mikell, Young, Langston, and Jackson were indicted for conspiracy to possess with the intent to distribute cocaine base, in violation of 21 U.S.C. § 846. Prior to trial, each of the appellants filed motions to suppress the evidence that was seized during the vehicle stop and the warrantless search of the apartment. Mikell also filed a motion to suppress the statements he had made following his arrest. The district court denied the motions.

Subsequently, the appellants were tried by a jury and found guilty. Prior to trial the government filed an information, in which it set forth two prior drug offenses on which the government intended to rely to enhance Mikell's sentence to a mandatory term of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A)(iii). Prior to sentencing, Mikell filed a response, in which he asserted that one of these prior convictions was unconstitutional. The district court ruled that Mikell could not collaterally attack that prior conviction and sentenced him to life imprisonment. The court also sentenced Young to life imprisonment and sentenced Langston to 121 months of imprisonment to be followed by 60 months of

supervised release.[2]  These appeals followed.

## II. STANDARDS OF REVIEW

A district court's findings of fact when ruling on a motion to suppress evidence are reviewed for plain error; the application of the law to the facts is reviewed *de novo. United States v. Hromada,* 49 F.3d 685 (11th Cir.1995).  When considering a ruling on a motion to suppress, the court must construe all facts in the light most favorable to the party prevailing in the district court. *United States v. Behety,* 32 F.3d 503 (11th Cir.1994).  Whether Mikell can collaterally attack a prior conviction involves a question of statutory construction and is subject to *de novo* review. *James v. United States,* 19 F.3d 1 (11th Cir.1994).

## III. DISCUSSION

### A. Warrantless Search

Mikell, Young, and Langston challenge evidence of their cocaine base manufacture obtained pursuant to a warrantless search as violative of their Fourth Amendment rights.  Even in the absence of probable cause, the police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990).  In justifying such an intrusion, the "reasonableness" standard

---

[2]Langston also contends that the district court erred in refusing to admit a search warrant affidavit into evidence and in applying the Sentencing Guidelines for cocaine base instead of for cocaine hydrochloride.  In addition, Young contends that there was insufficient evidence to show that he knew about and voluntarily joined the conspiracy.  After reviewing the record, we find these arguments to be without merit.

requires that a police officer "be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. "[R]easonable suspicion" is determined from the totality of the circumstances, *United States v. Sokolov,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), and from the collective knowledge of the officers involved in the stop. *United States v. Williams,* 876 F.2d 1521 (11th Cir.1989). "Such a level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence ... or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found." *Tapia,* 912 F.2d at 1370. Nevertheless, the police are required to articulate some minimal, objective justification for the stop. *Id.*

The warrantless search of a home is "presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). A warrantless search is allowed, however, when both probable cause and exigent circumstances exist. *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir.1991). Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be discovered in a particular place. Exigent circumstances exist when authorities have reason to believe that evidence is in danger of being destroyed or removed. *Id.*

This court has held that the need to invoke the exigent circumstances exception to the warrant requirement is "particularly compelling in narcotics cases" because narcotics can be quickly

destroyed. *United States v. Young,* 909 F.2d 442, 446 (11th Cir.1990). The test of whether exigent circumstances exist is an objective one. *Id.* The appropriate inquiry is whether the facts would lead a reasonable and experienced police officer to believe that evidence might be destroyed or removed before a warrant could be secured. *Id.* We have noted, however, that a warrantless search is illegal when police possess probable cause but instead of obtaining a warrant create exigent circumstances. *Tobin,* 923 F.2d at 1510-11.

In this case, we hold that the information available to the officers who stopped the defendants-appellants' car permitted persons of reasonable caution to believe that the car contained cocaine and that the occupants of the car had recently participated in the manufacture of crack cocaine. Although not all of the information that the police officers received from the anonymous tipster could be verified, other evidence suggested that the tipster's information regarding the possession of powder cocaine and the manufacture of crack cocaine was true. As the tipster predicted, three people arrived at the subject apartment late on the evening of May 11, 1994, in a car associated with Young. One of these individuals left the apartment in the middle of the night and purchased a large box of baking soda, which is commonly used to manufacture crack cocaine.

Further, these persons left the apartment some time later, with one of the individuals carrying a duffle bag in which cocaine could have been hidden. Mikell, Young, and Langston then attempted to evade police pursuit by leading the authorities on a chase in

which the defendants-appellants' car traveled at a speed of at least eight-five miles per hour. The subject car was weaving and swerving and eventually crashed into a patrol car before coming to a stop. In addition, during the pursuit the authorities observed small plastic bags being thrown from one of the windows of the automobile.

In light of the evidence, we hold that the district court did not err in finding that the officers had reasonable suspicion to believe that the occupants of the car had just left an apartment where crack cocaine was being manufactured and that they were in possession of cocaine. Moreover, we conclude that the evidence presented at the suppression hearing supports the district court's finding that the officers' warrantless entry into the subject apartment was supported by probable cause and justified by exigent circumstances. In addition to the evidence discussed above, the officers secured substantial additional evidence as a result of the vehicle stop.

First, the officers gathered several bags and numerous chunks of suspected cocaine which had been thrown from the car during the chase that preceded the arrests. The officers also observed suspected cocaine scattered throughout the car. None of the cocaine found in the car or on the roadside was in the form of crack cocaine, although the tipster had stated that the Mikell, Young, and Langston would be manufacturing crack cocaine and the officers had seen Langston buying a large box of baking soda. Thus, because the cocaine that the officers gathered was not in the form of crack cocaine, the officers could have reasonably suspected

that crack cocaine might remain in the apartment.

Additionally, the authorities had seen Young talking on a cellular phone while being pursued. Because the officers believed that someone remained in the apartment, it was not unreasonable for the officers to conclude that Young could have been instructing that person to destroy the cocaine and other related evidence that was located in the apartment. Consequently, they conducted a protective survey of the apartment to ensure that evidence was not destroyed. Since the facts that appeared to the officers at the time of entry into the apartment could have led a reasonable, experienced police officer to believe that the destruction of evidence might occur before a warrant could be secured, the district court's holding that exigent circumstances existed is not erroneous.

## B. Right to Remain Silent

Mikell argues that the district court erred by failing to suppress the statements that he made following his arrest because the officers elicited such statements from him in violation of his Fifth Amendment right to remain silent. Specifically, he contends that the interrogating officers continued to question him after he had refused to answer certain questions. Mikell claims that his refusal to answer various questions constituted an equivocal invocation of his right to remain silent. Accordingly, he asserts that the interrogating officers should have limited their questions to clarifying his equivocal assertions of his Fifth Amendment rights. Mikell contends that, by failing to do so, the officers violated *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966), and that his statements should have been suppressed. We disagree.

The Supreme Court has held that, when a person is undergoing a custodial interrogation and he indicates in any manner, at any time prior, to or during questioning, that he wishes to remain silent, the interrogation must stop. *Miranda,* 384 U.S. at 473-74, 86 S.Ct. at 1627-28. Before the Supreme Court's decision in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), this court had held that, when a defendant makes an equivocal request for an attorney during a custodial interrogation, the scope of interrogation is immediately narrowed to clarifying that request. *Coleman v. Singletary,* 30 F.3d 1420, 1423-24 (11th Cir.1994). The same rule applied to equivocal invocations of the right to terminate questioning. *Id.*

The Supreme Court's decision in *Davis,* however, changed this "clarification only" rule. In *Davis,* the Court held that a defendant must articulate his desire to have counsel present with sufficient clarity so that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney. 512 U.S. at ----, 114 S.Ct. at 2355. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at ----, 114 S.Ct. at 2356. In light of this ruling, we have also determined that a suspect must articulate his desire to end questioning with sufficient clarity so that a reasonable police officer would understand that statement to be an assertion of the right to remain silent. *Coleman,* 30 F.3d at 1424. If the

statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation. *Id.*

In this case, it is undisputed that after Mikell was informed of his *Miranda* rights, he was informed by the interrogating officers that he could stop answering the questions at any time. In addition, it is uncontroverted that the officers told Mikell that, if he did not want to answer a particular question, he did not have to do so. At no time during the interrogation did Mikell indicate that he wanted the questioning to cease. He simply refused to answer certain questions, by either remaining silent or shaking his head, while continuing to answer other questions.

Pursuant to *Davis,* we hold that a suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and that questioning may continue until the suspect articulates in some manner that he wishes the questioning to cease. After a knowing and voluntary waiver of *Miranda* rights, law enforcement officers may continue questioning "until and unless the suspect clearly requests" that the questioning cease. *Davis,* 512 U.S. at ----, 114 S.Ct. at 2356. Because Mikell did not clearly request that the questioning stop, the district court did not err in denying his motion to suppress.

## C. Mikell's Sentence

When sentencing Mikell, the district refused to allow him to present a collateral attack on one of his prior convictions upon which the court relied when enhancing his sentence to life

imprisonment. Prior to sentencing, Mikell specifically alleged, in response to the information filed by the government, that counsel which represented him at the previous state court proceeding had a conflict of interest because he represented both Mikell and a codefendant. Thus, Mikell argues that he was denied effective assistance of counsel at that proceeding and that his plea of guilty was, therefore, subject to constitutional attack. *See Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Relying on *United States v. Roman,* 989 F.2d 1117 (11th Cir.1993) (en banc), the district court held that a sentencing court may not examine the constitutionality of a defendant's earlier state conviction when calculating a sentence, except in the narrow case, not applicable here, when a defendant alleges that his state conviction was wholly uncounseled.

The government concedes that the district court's reliance on *Roman* was misplaced. *Roman* concerned the calculation of a defendant's criminal history for purposes of the federal Sentencing Guidelines. Mikell, however, was not sentenced under the Sentencing Guidelines but under 21 U.S.C. § 841(b)(1)(A)(iii). The provisions for implementing the sentence enhancement scheme set forth in section 841 are found in section 851. That statute specifically sets forth a procedure by which a defendant who is subject to a statutory sentence enhancement may challenge the constitutionality of an earlier conviction that is the basis for the enhancement. Such challenge is not as limited as that permitted by *Roman* when the enhancement is pursuant to the

Sentencing Guidelines but, instead, allows a defendant to assert any constitutional challenge to his prior conviction. 21 U.S.C. § 851(c)(2). Because the district court's refusal to allow Mikell to attack the constitutionality of his prior conviction was error, we vacate Mikell's sentence and remand for resentencing.

## IV. SUMMARY

The convictions of Mikell, Young, and Langston are AFFIRMED. Although the district court correctly denied Mikell's suppression motion regarding his refusal to answer certain questions during his custodial interrogation, Mikell's sentence is VACATED, and the case is REMANDED for re-sentencing consistent with this opinion.