[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 28, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-11411
Non-Argument Calendar
_____

D. C. Docket No. 04-80010-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILKERSON ESTELAN,
a.k.a. Estalan Wilkerson,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 28, 2005)

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Wilkerson Estelan appeal his convictions and total 135-month sentence following a jury trial for being a convicted felon in possession of one or more firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count 1"); possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii) ("Counts 2 & 7"); possession of cocaine, in violation of 21 U.S.C. § 844 ("Count 3"); and possession with intent to distribute a detectable amount of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) ("Counts 4, 5 & 6"). Estelan argues that the district court (1) applied an incorrect legal standard in determining that Estelan's post-arrest statements were voluntary; (2) abused its discretion in denying Estelan's objection to the government's introduction of expert testimony from a Drug Enforcement Administration ("DEA") agent regarding drug-distribution amounts, pursuant to Fed.R.Evid. 702; and (3) plainly erred in counting prior state convictions, which the court had found to be constitutionally invalid for purposes of enhancement under 21 U.S.C. § 851, in calculating Estelan's criminal-history points. For the reasons set forth more fully below, we affirm.

Estelan filed three motions to suppress post-arrest statements. In his first suppression motion, he argued that, on December 22, 2003, after he was arrested, and after he invoked his right to remain silent under Miranda v. Arizona, 384 U.S.

2

436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), law enforcement officers (1) continued to question him, and (2) secretly recorded conversations he had with family members. In Estelan's second suppression motion, he contended that his post-arrest statement on December 22, 2003, in which he admitted to possessing drugs recovered during the execution of a search warrant, also should be suppressed because it was the product of unlawful threats and intimidation by law enforcement officers, that is, the product of an officer's threat to arrest his mother and sister if he did not admit ownership of the drugs. Finally, in Estelan's third suppression motion, he again contended that the post-arrest statements he made to officers on December 22, 2003,[1] should be suppressed because they were (1) obtained in violation of his right to remain silent, and (2) the result of unlawful threats and intimidation by officers.[2]

---

[1] Although the magistrate judge in her report and recommendation construed Estelan's third suppression motion as challenging post-arrest statements Estelan made on November 18, 2003, Estelan clarified in his objections to this report that his third suppression motion involved the post-arrest statement he made on December 22, 2003. Thus, to the extent Estelan is challenging on appeal the post-arrest statement he made on November 18, 2003, he arguably did not raise this challenge in the district court. Nevertheless, because the magistrate addressed this statement in her report, and because the government has not argued that this challenge is newly raised on appeal, we also will treat Estelan's suppression motions as covering statements made on both dates.

[2] The district court, in adopting the magistrate's report and recommendation, denied Estelan's motions to the extent he was arguing that they were obtained after he invoked his right to remain silent. Because Estelan has not challenged this determination on appeal, we deem any arguments on it abandoned. See United States v. Levy, 416 F.3d 1273, 1275 (11th Cir.) (explaining that an argument not raised in an appellant's opening brief is deemed abandoned), petition for cert. filed, (U.S. Oct. 6, 2005) (No. 05-6930).

The government responded that, on November 18, 2003, officers did not threaten to arrest members of Estelan's family if Estelan refused to claim ownership of the drugs and firearms that the officers had recovered. The government also responded that an officer's statement on December 22, 2003, that is, that he might arrest Estelan's mother and sister for possessing drugs, was not unduly coercive because the officer had probable cause to make these arrests.

After conducting an evidentiary hearing, the magistrate issued a report, recommending that all of Estelan's suppression motions be denied. Although the record on appeal does not contain a transcript of this evidentiary hearing, Estelan did not challenge in his objections to the magistrate's report the magistrate's factual findings, at least as they relate to Estelan's arguments on appeal. Moreover, Estelan has failed to argue on appeal that these factual findings were erroneous, plainly or otherwise. See United States v. Warren, 687 F.2d 347, 348 (11th Cir. 1982) (explaining that the absence of objections to the magistrate's report, prepared pursuant to 28 U.S.C. § 636(b)(1)(B), limits appellate review of factual findings to plain error or manifest injustice). We, therefore, conclude that Estelan has abandoned any challenges to the following factual findings by the magistrate in her report.

Officer Brian Hermanson, an officer with the Lake Worth Police Department

since October 1991, and a member of a special investigation unit that focuses on narcotics and gang activity, testified that, on November 18, 2003, at approximately 12:26 p.m, he helped execute a search warrant at a residence in Lake Worth, Florida. When the officers arrived at this residence, they knocked and announced their presence. On hearing a door slam, the officers entered the residence. Another officer found Estelan in the restroom, bent over a toilet containing a large piece of cocaine base. Estelan's mother and another person also were present in the residence. After Estelan was arrested and advised of his Miranda rights, he told Officer Hermanson that the firearms and drugs found in a drawer in the bedroom of the residence belonged to him. The officers neither used force against Estelan, nor threatened to arrest his family members. Moreover, Estelan was lucid, had normal speech patterns, and did not appear to be under the influence of drugs or alcohol.

Officer Sanjay Raja, an officer with the West Palm Beach Police Department since February 2004, testified that, on December 22, 2003, as part of his previous employment with the Lake Worth Police Department, he executed a search warrant of this same residence. On entering the residence, he observed Estelan's mother, Violette Estelan, in the living room, in close proximity to a stack of boxes, on top of which officers ultimately recovered in plain view a dime-size piece of cocaine base, weighing approximately .1 grams. The officers executing the search warrant

also recovered cocaine base in a compact-disc case and $725 in a small refrigerator in the north bedroom. Estelan's sister, Wilda Estelan, arrived at the residence during this search, at which time she identified the north bedroom as her bedroom and agreed to call Estelan.

Officer Raja further stated that, when Estelan responded by coming to the residence, Estelan was detained, was advised of his rights, and waived his right to remain silent. Officer Raja then informed Estelan what contraband the officers had recovered from the residence, along with explaining that they did not want to arrest anyone who was not involved with the drugs. When Officer Raja asked Estelan if he was involved with the drugs, Estelan gave conflicting answers over his ownership of the drugs. The officers then took Estelan outside the residence and questioned him while he was sitting next to his mother and sister. Although Estelan first stated that the drugs belonged to him, and not his mother and sister, he recanted this statement within minutes. During this questioning, Estelan again appeared lucid, had normal speech, was clear eyed, did not appear to be under the influence of drugs or alcohol, and did not request an attorney.[3]

---

[3] Officer Raja also conceded that, after he spoke with Estelan's mother and sister about the possibility of arresting them, and after the officers transported Estelan to the police station, he permitted these family members to speak to Estelan, with their conversations "surreptitiously videotaped," with the hope that Estelan would admit to them that he owned the drugs.

Estelan, who was 21 years' old and had completed the 11th grade at the time of the evidentiary hearing, also testified, stating, among other things, that Officer Hermanson informed him, after his November 18, 2003, arrest, that the officers would have Estelan's mother and grandmother deported and/or arrested for possession of the drugs and guns if Estelan did not admit to owning this contraband. Although both his mother and grandmother were legal residents, Estelan still feared for their freedom. Estelan also testified that, on December 22, 2003, he admitted to owning drugs recovered from the residence only because he was scared that his mother and sister would be arrested. Additionally, the magistrate noted that, in a videotape of Estelan's November interrogation, Estelan appeared relaxed and "laid back," and he did not ask about his family.

The magistrate determined, among other things, that, the post-arrest statement made on November 18, 20003, was not coerced because Officer Hermanson's testimony, that he did not threaten to arrest Estelan's family members, was more credible than Estelan's contrary testimony. The magistrate also concluded that Estelan's waiver of his right to remain silent on December 22, 2003, was voluntary, despite that Estelan testified that the officers threatened, otherwise, to arrest his mother and sister, because the officers had found cocaine base in plain view of Estelan's mother and drugs in the bedroom occupied by

7

Estelan's sister. The magistrate concluded that, based on these facts, the officers had probable cause to arrest these family members for possession of drugs, and their threat to do so, therefore, was not coercive. The magistrate also explained that her review of the videotapes of the November interrogation of Estelan, during which Estelan was relaxed and did not ask about his family, showed that Estelan voluntarily waived his right to remain silent.[4] The court summarily adopted the magistrate's report and denied all of Estelan's suppression motions.

At trial, the government offered the following additional evidence. Officer Neil Honkala, an officer with the Lake Worth Police Department, testified that, on November 18, 2003,[5] when he entered the residence in question to execute a search warrant, he heard a toilet flushing and determined that the restroom door was locked. When Officer Honkala attempted to kick the restroom door open, Estelan, who was inside the restroom, forcefully slammed the door shut. Officer Honkala

---

[4] Estelan objected to this report, arguing that the fact that he made post-arrest statements did not establish that he voluntarily waived his right to remain silent. Estelan contended that he testified that he was threatened with the arrest of family members on November 18, 2003, and that the government did not claim that the officers had probable cause to arrest members of his family on this date. He also argued that the officers did not have probable cause to arrest his mother and sister on December 22, 2003, because (1) the probable cause affidavits for both search warrants were based solely on Estelan's illegal activity, (2) his mother and sister were not arrested after the first search revealed both drugs and guns in their residence, (3) the cocaine base recovered from the cluttered living room was a small amount; and (4) the cocaine base recovered from his sister's room was in a closed container.

[5] Although the government asked Officer Honkala about a search on November 13, 2003, it, presumably, was referring to the November 18, 2003, search.

eventually forced the door open, at which time he observed the toilet flushing and several large pieces of cocaine base inside it.

Officer Hermanson testified, and the parties stipulated, that, after the officers arrested Estelan and searched the residence on November 18, 2003, they recovered miscellaneous documents in Estelan's name on the dining room table and in the top drawer of a dresser in the residence's north bedroom. The officers also found cocaine base and powder in the top drawer of the same dresser, as well as a loaded semiautomatic pistol on the top shelf of a closet inside the north bedroom, and a loaded assault rifle wrapped in a football jersey in another bedroom.

Officer Raja also testified at trial, explaining that, on December 22, 2005, in addition to the dime-size amount of cocaine base that the officers recovered from the living room, they discovered in one of the bedrooms a small unplugged refrigerator containing $725 in cash and an open CD case containing more cocaine base. When Estelan's 14-year-old sister entered the residence during this search, the officers instructed her to call Estelan, gave her and Estelan's mother Miranda warnings, and handcuffed them outside the apartment. When Estelan arrived at the apartment, he also was handcuffed and given Miranda warning, after which Estelan was informed that, based on the locations of the drugs found in the residence, the officers had probable cause to arrest his mother and sister. After giving conflicting

9

statements inside the residence, Estelan was taken outside the residence, where he stated, in front of his mother and sister, that he owned the drugs and that the officers should release these family members.

After being re-sworn, Officer Hermanson additionally testified that, on January 3, 2004, on two separate occasions, a confidential informant ("CI") of the Lake Worth Police Department, while being videotaped, made undercover buys of cocaine base from Estelan. Estelan was not arrested on this date because of the ongoing nature of the investigation and the police department's need to keep the CI's identity confidential. Officer Raja also testified again, after being re-sworn, stating that, on January 22, 2004, pursuant to a federal arrest warrant for Estelan, Officer Raja and other officers attempted to arrest Estelan.[6] When Estelan ran away from them, Officer Raja observed Estelan throw a small fluorescent object over a fence. After apprehending Estelan and searching the area where Estelan threw this object, Officer Raja discovered a fluorescent green Excedrin bottle containing a substance that the government later confirmed was cocaine base.

Furthermore, during trial, the government sought to qualify Special Agent Richard Bonner, a special agent with the U.S. Drug Enforcement Administration ("DEA"), as "an expert in street level narcotics and trafficking and specifically in

---

[6] Although Officer Raja first stated that he arrested Estelan in January 2, 2004, he subsequently clarified that the arrest occurred on January 22, 2004.

crack cocaine and cocaine powder." Special Agent Bonner testified that, as an

agent with the DEA for approximately four years and four months, he had

(1) received specialized training in the distribution and trafficking of illegal drugs,

particularly with Schedule I and II controlled substances; (2) participated in

hundreds of investigations involving the distribution of cocaine base; and

(3) interviewed in excess of 100 persons involved in the illegal distribution of

cocaine and cocaine base. Prior to serving in his current position, Special Agent

Bonner also had been employed for approximately eight years as a police officer,

working extensively on narcotic cases.

On questioning by Estelan, Special Agent Bonner conceded that he never

had published articles on street-level dealing of cocaine base, nor been subject to

peer review or evaluation. Special Agent Bonner also agreed that his methodology

for his opinions was based solely on his training, observations, and experiences.

Estelan then objected to Special Agent Bonner testifying as an expert witness,

arguing that the government had failed to meet Rule 702's requirements for such

testimony.[7] The court overruled this objection, summarily explaining that, after

examining caselaw both from this Court and the Supreme Court, it had concluded

---

[7] In addition to raising at trial his objection to Special Agent Bonner's expert testimony, Estelan filed pretrial a motion to exclude this testimony. The court, however, did not address this motion until the trial had commenced.

11

that this expert testimony was admissible under Rule 702.[8]  Special Agent Bonner

then testified on how cocaine base typically is sold and why the amounts of

cocaine base that were recovered from the toilet, drawer, and refrigerator in

Estelan's residence, and the cocaine base contained in the Excedrin pill bottle that

Estelan threw over the fence, were indicative of distribution, instead of personal

use.  On May 5, 2004, the jury convicted Estelan of all counts in his indictment.

Prior to sentencing, Estelan filed a denial of the three prior state convictions

on which the government was relying in attempting to statutorily enhance his

sentence, pursuant to 21 U.S.C. § 851.[9]  Attaching copies of the transcripts of his

change-of-plea hearings, Estelan argued that these convictions were

constitutionally invalid because (1) they were the result of guilty pleas that were

not knowing and voluntary, and (2) he did not receive effective assistance of trial

counsel.  The government opposed Estelan's denial, arguing that the plea

transcripts and the plea-waiver forms showed that Estelan received effective

assistance of counsel, and that his pleas followed the requirements outlined in

Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

---

[8]  The court also denied Estelan's objection to the introduction of this expert testimony to the extent Estelan was relying on Fed.R.Evid. 401 and 403.  Because Estelan has not challenged this ruling on appeal, we deem any arguments on it abandoned.  See Levy, 416 F.3d at 1275.

[9]  The government had filed a pretrial notice, pursuant to 21 U.S.C. § 851, notifying Estelan of its intent to rely on three of his prior state felony drug convictions in seeking an enhanced sentence in the instant offense, as required in 21 U.S.C. § 851(b).

Also prior to sentencing, a probation officer prepared a PSI, recommending that Estelan's offense level be set at 28, pursuant to U.S.S.G. § 2D1.1(c)(6), and that it be increased two levels, pursuant to U.S.S.G. § 2D1.1(b)(1), because Estelan possessed a dangerous weapon. The PSI also included that Estelan had nine criminal-history points, which included seven points, pursuant to U.S.S.G. § 4A1.1(c), based on Estelan's prior convictions,[10] and two additional points, pursuant to U.S.S.G. § 4A1.1(e), because he committed the instant offense less than two years from his date of release from custody for a prior offense. With a total offense level of 30 and a criminal history category of IV, Estelan's guideline range was 135 to 168 months' imprisonment.

On January 19, 2005, at sentencing, Estelan renewed his objection to the court's reliance on three prior convictions for purposes of statutorily enhancing his sentence under § 851. After hearing arguments from counsel and extensive testimony from Estelan, the court determined that these prior convictions could not be used to support a statutory sentencing enhancement under § 851, because the "plea colloquies [did not] measure[] up to the requirements of due process," and

---

[10] These prior convictions included three convictions that Estelan had denied and that the court eventually found at sentencing to be constitutionally invalid for purposes of relying on them to statutorily enhance Estelan's sentence under 21 U.S.C. § 851, that is, (1) two consolidated state convictions in Palm Beach County, Florida, for felony sale of cocaine, in Case Nos. 02-14569CFA02 and 02-2291CFA02, on May 30, 2003; and (2) a state conviction in Palm Beach County, Florida, for felony possession of marijuana, in Case No. 03-10472CFA02, on October 10, 2003.

13

the government had not shown that Estelan, during the state allocutions, had fully understood "what he was doing [and] the nature of his acts." The court, however, noted that it was not finding that Estelan's trial counsel was ineffective. The court also restated, without objection, the PSI's calculations, including that Estelan had a criminal history category of IV, and a resulting guidelines range of 135 to 168 months' imprisonment.

The court then considered the sentencing factors listed in 18 U.S.C. § 3553(a), including Estelan's discretionary guideline range. In doing so, the court stated that it had "looked carefully at [Estelan's] prior convictions, what they consisted of, the way they were treated and so on." The court ultimately sentenced Estelan to a total sentence of 135 months' imprisonment, 4 years' supervised release, and a $625 special assessment fee. When the court asked Estelan if he had any new objections to the court's pronouncement of his sentence, Estelan answered in the negative.

**Issue 1:     Estelan's Post-Arrest Statements**

Estelan argues that the court erred in denying his motion to suppress post-arrest statements he made to law enforcement officers on November 18 and December 22, 2003, because the court did not look at the totality of the circumstances in deciding whether these statements were voluntary. Estelan

contends that the court, instead, focused entirely on its conclusion that the officers had probable cause on December 22, 2003, to arrest Estelan's mother and sister. Without identifying what circumstances the court ignored, Estelan also asserts that, if the court had examined the totality of the circumstances, it would have concluded that his post-arrest statements were not the product of his free and rational choice. Finally, Estelan claims that, because the post-arrest statements were the "only real evidence that the government had that the drugs and firearms belonged to [him]," and because the government failed to show that these statements did not contribute to his convictions, the error was not harmless.

"[We] review[] a district court's factual findings supporting the denial of a motion to suppress for clear error, and in the light most favorable to the [g]overnment. The application of the law to the facts is reviewed de novo." United States v. Thompson, 422 F.3d 1285, 1295 (11th Cir. 2005) (citation omitted). Under the Fifth Amendment to the United States Constitution, the government may not use an involuntary confession against a defendant in a criminal trial. Id. We focus our voluntariness inquiry "on whether the defendant was coerced by the government into making the statement: The relinquishment of the right [to remain silent] must have been voluntary in the sense that it was the product of a free and deliberate choice[,] rather than intimidation, coercion or

15

deception." Id. (internal marks and quotations omitted). Moreover, "[t]he district court must consider the totality of the circumstances in assessing whether police conduct was 'causally related' to the confession." Id. (quotation omitted).

Under certain circumstances, police deception invalidates an accused's waiver of his right to remain silent. Thompson v. Haley, 255 F.3d 1292, 1296 (11th Cir. 2001) (citing Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (in a habeas case, a confession was involuntary when the police pretended that, if the defendant did not confess, the defendant's ailing wife would be arrested)). However, in Thompson, we determined that a law enforcement officer's statement to a habeas petitioner that his codefendant girlfriend might face the electric chair if the petitioner did not confess to committing a murder did not render the petitioner's post-arrest statement involuntary because the petitioner's girlfriend had voluntarily implicated herself in the murder prior to the defendant's arrest. Thompson, 255 F.3d at 1296. We explained that, under these circumstances, the officer had probable cause to arrest the petitioner's girlfriend and the officer's statement of this fact to the petitioner, therefore, did not constitute coercion. Id. at 1297.

Similarly, in Martin v. Kemp, 760 F.2d 1244 (11th Cir. 1985), we examined a habeas petitioner's argument that his guilty plea was involuntary because it was

prompted by police threats to bring charges against the petitioner's young, pregnant wife. Id. at 1247-48. Although we ultimately determined that the record was unclear on whether the police had probable cause to file charges against the petitioner's wife at the time this threat was made and that remand, thus, was warranted, we clarified that whether a threat to prosecute a third party is coercive depends upon whether probable cause exists to believe that the third party has committed a crime at the time that the threat is made. Id. at 1248-49.

Here, to the extent Estelan is arguing that the court should have concluded that his post-arrest statement on November 18, 2003, was coerced because he testified that he made this statement only because officers threatened, otherwise, to arrest members of his family, the court, through adopting the magistrate's report, determined that testimony denying such threats were made was more credible. Because "[t]he credibility of a witness is in the province of the factfinder," we "will not ordinarily review the factfinder's determination of credibility." See United States v. Copeland, 20 F.3d 412, 413 (11th Cir. 1994). Moreover, Estelan has not challenged Officer Hermanson's credibility on appeal, and a review of the record does not show that the court clearly erred in making this finding. Indeed, the court noted that, in the videotape of Estelan's November interrogation, Estelan appeared relaxed and "laid back," and he did not ask about his family.

17

In examining Estelan's December 22, 2003, post-arrest statement, Officer Raja admitted during the evidentiary hearing that he informed Estelan on this date what contraband the officers had recovered from the residence, along with explaining that they did not want to arrest anyone who was not involved with the drugs. Officer Raja, however, also testified that, when he entered the residence in question, he observed Estelan's mother in the living room, sitting in close proximity to cocaine base that was in plain view. Moreover, Officer Raja recovered cocaine base and $725 in cash from a small refrigerator in the room that Estelan's sister identified as her bedroom. Thus, similar to the facts in Thompson and Martin, probable cause existed to arrest Estelan's mother and sister for possession of drugs, and Officer Raja's statement to that effect did not result in Estelan's December post-arrest statement being involuntary. See United States v. Clay, 355 F.3d 1281, 1284 (11th Cir.) (explaining that "constructive" possession is sufficient to prove the possession prong under § 841(a), and that constructive possession in drug cases is established "by showing ownership or dominion and control over the drugs or over the premises on which the drugs are concealed" (quotation omitted)), cert. denied, 125 S.Ct. 626 (2004).

Furthermore, to the extent Estelan is arguing that the court erred in denying his suppression motions because the court failed to examine the totality of the

circumstances, and that these combined circumstances should have compelled the court to rule otherwise, as discussed above, a court must consider the totality of the circumstances in assessing whether a confession was voluntary. See Thompson, 422 F.3d at 1295. Estelan, however, neither raised this argument in the district court, nor has he identified on appeal other factors that rendered his statements involuntary.

Regardless, the record reflects that the court, although focusing primarily on Estelan's arguments relating to threats to arrest his family members, examined the other circumstances surrounding both of the post-arrest statements. Indeed, in summarizing the testimony given during the evidentiary hearing, the court specifically noted that (1) the November search was conducted at 12:26 p.m. in the afternoon; (2) the officers on this date, in addition to not threatening to arrest his family members, did not use force against him; and (3) Estelan was lucid, had normal speech patterns, and did not appear to be under the influence of drugs or alcohol. The court also included that, during the December incident, Estelan appeared lucid, had normal speech, was clear eyed, did not appear to be under the influence of drugs or alcohol, and did not request an attorney. In addition, the court noted that Estelan was 21 years' old and had completed the 11th grade at the time of the evidentiary hearing. Thus, we conclude that the district court

considered the totality of the circumstances, and it did not err in admitting at trial

Estelan's post-arrest statements.[11]

**Issue 2:       Expert Testimony**

Estelan also argues that the court abused its discretion in denying his motion

to exclude the expert testimony of DEA Agent Bonner regarding drug-distribution

amounts when the government failed to show that the testimony met the

requirements for admission of scientific expert testimony under Rule 702 and

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125

L.Ed.2d 469 (1993).[12]  Estelan explains that, in overruling his objection to this

expert testimony on an issue that was critical to three of his convictions, the court

ignored the facts that the expert could not identify the facts and data that were the

basis for his opinion, could not explain what method he used in reaching his

---

[11] As discussed above, the government argues that, even if the court erred in denying Estelan's suppression motions and in admitting his post-arrest statements, this error was harmless. The Supreme Court has determined that an erroneous admission of a coerced confession can be harmless error. See Arizona v. Fulminante, 499 U.S. 279, 295, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991). However, in determining whether a coerced confession was harmless error, the Supreme Court explained in Arizona that "[a] confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." See Fulminante, 499 U.S. at 296, 111 S.Ct. at 1257 (quotation and marks omitted). Here, we need not determine the issue of harmless error because no error occurred.

[12] Although Estelan included in the heading for this argument that the court erred in failing to hold an evidentiary hearing to determine whether the "fingerprint evidence" met the requirements of Rule 702 for admission as scientific expert testimony, he failed in his discussion to explain or cite to the record in support of this contention. Thus, it appears that the inclusion of this contention was not intended.

opinion, and conceded that whatever method he used had not been subjected to peer review and publication.

We will reverse when a district court's <u>Daubert</u> ruling "amount[s] to an abuse of discretion that affected the outcome of a trial." <u>United States v. Brown</u>, 415 F.3d 1257, 1266 (11th Cir. 2005). An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment. <u>Id.</u> However, "the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under <u>Daubert</u>," and we "give[s] the district court considerable leeway in the execution of its duty." <u>Id.</u> (internal quotation and marks omitted). Moreover, this rule is applicable whether the court admits or excludes expert testimony, and even if the <u>Daubert</u> issue is outcome determinative. <u>Id.</u>

Rule 702 includes as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

In <u>Daubert</u>, the Supreme Court generally discussed the district court's role as

a gatekeeper in determining whether expert testimony on scientific matters is admissible under Rule 702. Daubert, 509 U.S. at 589, 113 S.Ct. at 2794-95. The Daubert Court also set out a list of "general observations" for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including (1) whether it can and has been tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field. Id. at 593-94, 113 S.Ct. at 2796-97. The Daubert Court, however, clarified that federal courts should not apply these factors rigidly, but instead should use them as "flexible" guidelines in applying Rule 702. Id. (explaining that "[m]any factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test").

In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court subsequently elaborated on the flexible nature of this inquiry, explaining that Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Id., 526 U.S. at 141, 119 S.Ct. at 1171. Whether the Daubert opinion factors are even pertinent to assessing reliability in a case will "depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. at 150, 119 S.Ct. at

22

The <u>Kumho</u> Court further explained that it could:

> neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in <u>Daubert</u>, nor [could it] now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

<u>Id.</u>

We have determined that the Supreme Court's holding in <u>Kumho</u> means that "expert testimony that does not meet all or most of the <u>Daubert</u> factors may sometimes be admissible." <u>Brown</u>, 415 F.4d at 1268. Indeed, in <u>Brown</u>, we concluded that a court did not abuse its discretion in admitting expert testimony from two government witnesses on the chemical structure of certain drugs, which testimony the experts explained was "based on their knowledge, skill, and experience," and on "sufficient facts and data," even though the government failed to show <u>Daubert</u> factors such as "testability" and peer review. <u>Id.</u> at 1268-69.

In the instant case, the court overruled Estelan's objection to Special Agent Bonner's testimony, as "an expert in street level narcotics and trafficking and specifically in crack cocaine and cocaine powder," on how cocaine base typically is sold and why the amounts of cocaine base that were recovered from the toilet, drawer, and refrigerator from Estelan's residence, and the cocaine base in the Excedrin pill bottle, were indicative of distribution, instead of personal use.

Special Agent Bonner conceded that he never had published any articles on street-level dealing of cocaine base, nor been subject to peer review or evaluation. Special Agent Bonner also agreed that his methodology for his opinions was based solely on his training, observations, and experiences. Thus, similar to the facts in Brown, the government failed to establish all of the factors discussed in Daubert.

Regardless, as discussed above, "expert testimony that does not meet all or most of the Daubert factors may sometimes be admissible." See Brown, 415 F.4d at 1268. The government elicited from Special Agent Bonner that, as an agent with the DEA for approximately four years and four months, he had (1) received specialized training in the distribution and trafficking of illegal drugs, particularly with Schedule I and II controlled substances; (2) participated in hundreds of investigations involving the distribution of cocaine base; and (3) interviewed in excess of 100 persons involved in the illegal distribution of cocaine and cocaine base. Special Agent Bonner also stated, without any challenges, that he previously had been employed for approximately eight years as a police officer, working extensively on narcotic cases, and that, as a result of this training and experience, he had become familiar with the conduct and trafficking techniques of street-level narcotic distributors.

Furthermore, "[t]he rule is well-established that an experienced narcotics

24

agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business." See United States v. Butler, 102 F.3d 1191, 1199 (11th Cir. 1997) (quotation omitted). In Butler, we concluded that the district court did not abuse its discretion in allowing testimony that money seized was packaged in "dealer folds"—a manner of packaging peculiar to drug dealers. See id. Similarly, in United State v. Robinson, 870 F.2d 612 (11th Cir. 1989), we determined, albeit prior to Daubert, that the district court did not err in admitting as expert opinion a police officer's testimony on drug dealing in Tallahassee, Florida, when the officer had been a police officer for over six years, had worked for the majority of this time in an area of the city where the major law enforcement problem was cocaine base, had arrested approximately 100 suspects for cocaine base offenses, and, for 8 months prior to his testimony, and had been a member of a police unit whose sole responsibility was to investigate cocaine base offenses. See id. at 613. Because Special Agent Bonner also offered uncontested testimony that he had extensive training and experience in the trafficking of cocaine base, we conclude that the court did not err in admitting his expert testimony on drug-trafficking amounts. See Brown, 415 F.3d at 1266.[13]

---

[13] Alternatively, as the government contends, the reversal is not warranted because the admission of this evidence did not affect the outcome of Estelan's trial. See Brown, 415 F.3d at 1266; see also United States v. Sellers, 906 F.2d 597, 601 (11th Cir. 1990) (explaining that non-constitutional evidentiary error not reversible under there is a "reasonable likelihood that the

**ISSUE 3:     Criminal-History Points**

Estelan last argues that the court plainly erred when it used prior convictions

that it had declared constitutionally invalid in calculating Estelan's criminal history

category.  Citing to U.S.S.G. § 4A1.1, comment. (n.6) and United States v. Cornog,

945 F.2d 1504, 1509 (11th Cir. 1991), Estelan contends that, when a district court

finds that a prior conviction is constitutionally invalid for a purpose other than

criminal history, it also must exclude that conviction and its corresponding

sentence "from all of its criminal history calculations."  Estelan also asserts that

this error was plain because his resulting higher guideline range created a

reasonable probability of a different outcome at sentencing.  Moreover, Estelan

summarily asserts that use of a constitutionally infirm criminal conviction to

enhance a defendant's sentence affects the fairness, integrity, or public reputation

of the judicial proceedings.

When a defendant raises an argument for the first time on appeal, such as

here, our review is only for plain error.  See United States v. Peters, 403 F.3d 1263,

1270 (11th Cir. 2005).  "Under plain error review, which is authorized by

---

defendant's substantial rights were affected").  In addition to Special Agent Bonner's testimony
on drug-distribution amounts, evidence at trial that demonstrated Estelan's intent to distribute
included (1) on November 18, 2003, officers recovered cocaine base and powder in the same
bedroom as a loaded Glock model 30, .45 semiautomatic pistol; (2) on December 22, 2003,
officers recovered from the same refrigerator cocaine base and $725 in cash; and (3) on January
3, 2004, on two separate occasions, a CI made undercover videotaped buys of cocaine base from
Estelan.

Fed.R.Crim.P. 52(b), federal appellate courts have only a limited power to correct errors that were forfeited because they were not timely raised in the district court." Id. at 1270-71 (internal quotations and marks omitted). Thus, we

> may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights. . . . Even then, we will exercise our discretion to rectify the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

Id. at 1271 (internal quotations and marks omitted).

In Cornog—the case relied on by Estelan—we examined a defendant's challenge to the district court's inclusion in its calculation of his criminal-history points convictions that the court had determined were constitutionally invalid for purposes of sentencing the defendant as a career offender, pursuant to U.S.S.G. § 4B1.1. Cornog, 945 F.2d at 1508-09. We concluded that, "if the [district] court properly held that the convictions were invalid—and therefore could not be counted—then it was bound to exclude them from all of its criminal history calculations." Id. at 1509. We further explained that this rule was true, even though the collateral inquiry undertaken by the court in determining the defendant's career-offender status was discretionary. Id.

In the instant case, both parties agree that, although the court determined that three of Estelan's prior felony convictions were constitutionally invalid for

purposes of enhancing his statutory sentence under § 851, the court counted these convictions in calculating Estelan's criminal-history points under U.S.S.G. § 4A1.1. Moreover, the government is not challenging the fact that the inclusion of the three criminal-history points from these convictions resulted in Estelan having a criminal history category of IV, and a guideline range of 135 to 168 months' imprisonment, instead of a criminal history category of III, and a guideline range of 121 to 151 months imprisonment. Instead, the government is arguing that this calculation was not erroneous under this Court's holding in Cornog because Cornog was decided prior to the Sentencing Commission's 1990 amendment to U.S.S.G. § 4A1.2—the guideline that specifies what convictions count in a defendant's criminal history score.

Indeed, when we decided Cornog in 1991, Application Note 6 to § 4A1.2 read in part: "Convictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score." U.S.S.G. § 4A1.2, comment. (n.6) (1990). Note 6, however, was amended in November 1993 to read:

> Sentences resulting from convictions that (A) have been reversed or vacated because of errors of law or because of subsequently discovered evidence exonerating the defendant, or (B) have been ruled constitutionally invalid in a prior case are not to be counted. With respect to the current sentencing proceeding, this guideline and commentary do not confer upon the defendant any right to attack collaterally a prior conviction or sentence beyond any such rights otherwise recognized in law (e.g., 21 U.S.C. § 851 expressly provides

28

that a defendant may collaterally attack certain prior convictions).

U.S.S.G. § 4A1.2, comment. (n.6) (1993) & (2003).   Based on a similar earlier

amendment,[14] this Court sitting en banc in United States v. Roman, 989 F.2d 1117

(11th Cir. 1993), held that the revised § 4A1.2 does not authorize a sentencing

court to inquire into the constitutional validity of a prior conviction, unless the

defendant adduces evidence sufficient to demonstrate that the conviction used to

enhance his sentence is presumptively void, which cases "are small in number and

are perhaps limited to uncounseled convictions." Id. at 1119-20.

Unlike the facts in Roman, however, Estelan challenged at sentencing the

constitutional validity of three prior convictions under § 851—a statutory

exception that the amendment to Application Note 6 explicitly discussed.  (See R1-

66; R6 at 562); see also U.S.S.G. § 4A1.2, comment. (n.6) (1991).  Indeed, we

have explained that § 851(c) specifically sets forth a procedure by which a

defendant who is subject to a statutory sentence enhancement may challenge the

constitutionality of an earlier conviction that is the basis for the enhancement.[15]

---

[14]  In November 1990, Application Note 6 was amended to read as follows: "[S]entences resulting from convictions that a defendant shows to have been previously ruled constitutionally invalid are not to be counted. . . .." See U.S.S.G. § 4A1.2, comment. (n.6) (1990)

[15]  Section 851(c)(1) specifically provides that, if a person files a written response to a § 851 information, denying any allegation of a prior conviction or claiming that a prior conviction is invalid, "the court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment." See 21 U.S.C. § 851(c)(1).

See <u>United States v. Mikell</u>, 102 F.3d 470, 477 (11th Cir. 1996).  The 1991 amendment to Application Note 6, therefore, did not affect our holding in <u>Cornog</u>, at least to the extent that the evidentiary hearing in which the sentencing court examined challenges to the constitutional validity of prior convictions was conducted under § 851.  Thus, contrary to the government's response on appeal, the court's counting under § 4A1.2 of three convictions that it had found to be constitutionally invalid under § 851 was erroneous under <u>Cornog</u>, and this error was plain.

Nevertheless, Estelan has failed to show that this error substantially prejudiced him.  To establish substantial prejudice, Estelan has the burden of showing that "there is a reasonable probability of a different result" if the court had not erred in calculating his criminal-history points.  See <u>United States v. Rodriguez</u>, 398 F.3d 1291, 1301 (11th Cir.) (applying plain-error test to error under <u>United States v. Booker</u>, 543 U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)), <u>cert. denied</u>, 125 S.Ct. 2935 (2005).  "[W]here the effect of an error on the result in the district court is uncertain or indeterminate—where we would have to speculate—the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error." <u>Rodriguez</u>, 398 F.3d at 1301.

Here, other than stating that his guideline range should have been 121 to 151 months' imprisonment, instead of the 135 to 168 month range that the court considered, Estelan has not cited to authority showing, or even explained, why he was substantially prejudiced when the court sentenced him to 135 months' imprisonment. Cf. United States v. Richardson, 166 F.3d 1360, 1361-62 (11th Cir. 1999) (reversible plain error occurred where the difference in the defendant's enhanced guideline range of 180 to 188 months was much greater than his unenhanced range of 70 to 87 months). Indeed, in discussing why it was imposing post-Booker a 135-month sentence, the court explained that it had considered § 3553(a)'s factors, and that it had "looked carefully at [Estelan's] prior convictions, what they consisted of, the way they were treated and so on." (See R6 at 638); see also U.S.S.G. § 4A1.2, comment. (n.6) (instructing that "the criminal conduct underlying any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 (Adequacy of Criminal History Category)"). Thus, although the court erred in calculating Estelan's guideline range, Estelan failed to establish that this error substantially prejudiced him.

Accordingly, we conclude that the district court did not err in determining that Estelan's post-arrest statements were voluntary and, thus, in denying Estelan's motions to suppress them. The court also did not abuse its discretion in denying

31

Estelan's objection to the government's introduction of expert testimony from Special Agent Bonner regarding drug-distribution amounts. Furthermore, although the court did plainly err in calculating Estelan's criminal-history points, Estelan has failed to establish that such error resulted in any prejudice. We, therefore, affirm Estelan's convictions and sentences.

**AFFIRMED.**